[No. S042591. May 15, 1997.]

PROFESSIONAL ENGINEERS IN CALIFORNIA GOVERNMENT et al.,
Plaintiffs and Respondents, v.
DEPARTMENT OF TRANSPORTATION et al., Defendants and
Appellants.

544

**COUNSEL**

Daniel E. Lungren, Attorney General, Floyd D. Shimomura, Assistant Attorney General, Linda A. Cabatic and Daniel G. Stone, Deputy Attorneys General, William M. McMillan, Richard W. Bower, O. J. Solander, Stephanie G. Sakai, Irell & Manella, Gregory R. Smith, Joanna Moore and David Z. Moss for Defendants and Appellants.

David I. Kelly, Douglas L. Kendrick, Anthony T. Caso, Sharon L. Browne, Francis F. Chin, Nossaman, Guthner, Knox & Elliott, Stephen N. Roberts, Stanley S. Taylor, Patricia Lee Connors, Robert D. Thornton, Kennedy & Wasserman, Wendel, Rosen, Black, Dean & Levitan, R. Zachary Wasserman, Bertha Ontiveros, Best, Best & Krieger, Steven C. DeBaun, Zumbrun & Findley, Ronald A. Zumbrun, John H. Findley, Woodruff, Spradlin & Smart, Kennard R. Smart, Jr., M. Lois Bobak and Jason E. Resnick as Amici Curiae on behalf of Defendants and Appellants.

Loren E. McMaster for Plaintiffs and Respondents.

Dennis F. Moss, Gary P. Reynolds, Harry J. Gibbons, Sam A. McCall, Jr., Neil Robertson, Williams, Romanski, Polverari & Skelton and Anthony M. Santana as Amici Curiae on behalf of Plaintiffs and Respondents.

## OPINION

CHIN, J.—We consider here important questions of law and policy arising under the state Constitution's civil service provision (Cal. Const., art. VII, § 1 (article VII)) and its implied mandate limiting the state's authority to contract with private entities to perform services the state has historically or customarily performed. (See, e.g., *State Compensation Ins. Fund* v. *Riley* (1937) 9 Cal.2d 126, 134-136 [69 P.2d 985, 111 A.L.R. 1503] (*Riley*); *California State Employees' Assn.* v. *State of California* (1988) 199 Cal.App.3d 840, 844 [245 Cal.Rptr. 232] (*CSEA*).) As we explain, the civil service mandate forbids private contracts for work that the state itself can perform "adequately and competently." (*Riley, supra,* 9 Cal.2d at p. 135.)

In April 1990, the trial court enjoined defendant state Department of Transportation (Caltrans) from privately contracting for engineering and inspection services that state civil service employees had traditionally performed on state highway projects. The trial court found Caltrans failed to show that these contracts were more cost-effective or that state workers could not adequately perform the work. The primary question we must decide is whether intervening legislation (Stats. 1993, ch. 433) (Chapter 433), reflecting broad legislative approval of private contracting by Caltrans, authorizes these contracts under the conditions set forth in that legislation and so affords a proper ground for dissolving or modifying the injunction.

Although the Court of Appeal majority concluded that Chapter 433 alone justified dissolution of the 1990 injunction, we disagree, believing the principles announced in prior case law require a contrary holding. If the constitutional civil service mandate is to retain any vitality as a protective device against the deterioration of the civil service system through private contracting, we must hold that Chapter 433 represents an invalid or ineffectual attempt to circumvent that constitutional mandate. As we explain, however, nothing prevents Caltrans from seeking modification of the 1990 injunction based on a showing that particular contracts are justified because state workers cannot perform the work "adequately and competently."

Because the discussion of the prior and current litigation would be largely meaningless without knowledge of the underlying legal principles, we will

outline the general constitutional and statutory principles before discussing their application to the facts of this case.

BACKGROUND

### I. The Civil Service Mandate

Article VII, like its predecessor, former article XXIV of the state Constitution, defines the state civil service as including "every officer and employee" of the state, with exceptions not pertinent here. (Art. VII, § 1, subd. (a); see Cal. Const., former art. XXIV, § 4, subd. (a).) The article further provides that "[i]n the civil service permanent appointment and promotion shall be made under a general system based on merit ascertained by competitive examination." (Art. VII, § 1, subd. (b); see Cal. Const., former art. XXIV, § 1.)

Article VII also creates the State Personnel Board (§ 2), to which enforcement and administration of the civil service laws are delegated (§ 3), and exempts from the civil service certain positions that are not pertinent here (§ 4). The state Civil Service Act (Gov. Code, § 18500 et seq.)[1] implements article VII. (See *California State Employees' Assn. v. Williams* (1970) 7 Cal.App.3d 390, 394-395 [86 Cal.Rptr. 305] (*Williams*).)

The ballot argument to the voters at the time California Constitution, former article XXIV was adopted in 1934 stressed the purpose of the civil service provision was " 'to promote efficiency and economy' " in state government by " 'prohibit[ing] appointments and promotion in the service except on the basis of merit, efficiency, and fitness ascertained by competitive examination. . . .' " (*Riley, supra,* 9 Cal.2d at p. 134.) Other than the general civil service provisions previously described, neither present article VII nor former article XXIV expressly prohibits or restricts private contracting. As one appellate decision has observed, "Decisional law interprets article VII as a restriction on the 'contracting out' of state activities or tasks to the private sector. [Citations.] The restriction does not arise from the express language of article VII. [Citation.] 'Rather, it emanates from an implicit necessity for protecting the policy of the organic civil service mandate against dissolution and destruction.' [Citation.]" (*CSEA, supra,* 199 Cal.App.3d at p. 844.)

### II. Decisional Law

Because of the largely implicit nature of the private contracting restriction, we must discern its scope from judicial decisions applying it in

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

particular cases. Early appellate decisions held that the civil service mandate forbids private contracting, whether for permanent or temporary services, skilled or unskilled, if those services are of a kind that persons selected through civil service could perform "adequately and competently." (*Riley, supra,* 9 Cal.2d at p. 135 [enjoining state agency from retaining private attorney]; see also *Burum* v. *State Compensation Ins. Fund* (1947) 30 Cal.2d 575, 579-582 [184 P.2d 505]; *Stockburger* v. *Riley* (1937) 21 Cal.App.2d 165, 170 [68 P.2d 741] (*Stockburger*) [enjoining state from hiring private independent contractors to clean state building].) *Riley* rejected the argument that the services independent contractors perform are beyond the civil service mandate's reach, stating that "[a]ny other construction of the constitutional provision would have the effect of weakening, if not destroying, the purpose and effect of the [civil service] provision." (*Riley, supra,* 9 Cal.2d at pp. 135-136.)

Later cases have affirmed the "nature of the services" restriction declared in *Riley,* but have also indicated that the restriction is inapplicable if the state seeks to contract for private assistance to perform *new functions* not previously undertaken by the state or covered by an existing department or agency. (See *Kennedy* v. *Ross* (1946) 28 Cal.2d 569, 571-574 [170 P.2d 904], [interpreting analogous civil service provision in city charter]; *San Francisco* v. *Boyd* (1941) 17 Cal.2d 606, 618-620 [110 P.2d 1036] [same]; *Williams, supra,* 7 Cal.App.3d at pp. 397-400 [permitting state to hire private insurance carriers to administer state Medi-Cal program].) As *Williams* observed, ". . . if the services cannot be adequately rendered by an existing agency of the public entity *or if they do not duplicate functions of an existing agency,* the contract is permissible." (*Williams, supra,* 7 Cal.App.3d at p. 397, italics added.) According to *Williams,* the civil service mandate is aimed at protecting "the existing civil service structure," and does not compel the state "to fulfill every new state function through its own agency." (*Ibid.*)

In *CSEA,* the appellate court upheld the facial constitutionality of legislation (§ 19130, subd. (a)) that allows the state to contract for "personal services" to obtain *cost savings,* if it can achieve these savings without ignoring other applicable civil service requirements (e.g., use of publicized, competitive bidding, no undercutting of state pay rates, no displacement of state workers or infringement of affirmative action plans, and no overriding public interest in having the state perform the function). (See *CSEA, supra,* 199 Cal.App.3d at pp. 844-846.) The court observed that allowing the state to consider cost savings in determining the propriety of private contracting would be consistent with the two main purposes of article VII, namely, " 'to

promote efficiency and economy'" in state government, and "to eliminate the 'spoils system' of political patronage." (*CSEA*, *supra*, 199 Cal.App.3d at p. 847.) *CSEA* opined that the voters who enacted the constitutional civil service provision did not intend to impose a system devoid of all considerations of fiscal responsibility and economy in favor of "an infinitely expanding public payroll," and agreed that "[t]he goal of maintaining the civil service must be balanced with the goal of a fiscally responsible state government." (*Id.* at p. 853.)

*CSEA* thus settled the question whether cost savings would be relevant in determining the validity of private contracting for work not involving any new state functions. The Court of Appeal in *Stockburger*, *supra*, 21 Cal.App.2d at page 167, had questioned the relevance of cost savings, but *CSEA* overruled that decision in light of the ballot argument's emphasis on "efficiency and economy." (*CSEA*, *supra*, 199 Cal.App.3d at p. 851.) *CSEA* determined that cost savings or efficiency would be a relevant, though not conclusive, factor in applying *Riley*'s "nature of the services" test. (*CSEA*, *supra*, 199 Cal.App.3d at p. 851.)

In *Department of Transportation* v. *Chavez* (1992) 7 Cal.App.4th 407 [9 Cal.Rptr.2d 176], Caltrans sought to enter into contracts with private firms to maintain roadside rest areas. The record indicated, however, that Caltrans had assumed responsibility for this work since 1963, so no "new state functions" were involved that might have justified an exception to the implied civil service mandate. (*Id.* at pp. 414-417; see *Williams*, *supra*, 7 Cal.App.3d at p. 397.) Moreover, Caltrans had not attempted to prove that private contracting could produce any substantial cost savings. (*Department of Transportation* v. *Chavez*, *supra*, 7 Cal.App.4th at p. 411.) Accordingly, the court ruled the private contracts invalid. (*Id.* at pp. 416-417.)

Finally, in *Professional Engineers* v. *Department of Transportation* (1993) 13 Cal.App.4th 585 [16 Cal.Rptr.2d 599] (*Professional Engineers*), the Court of Appeal held that, on an experimental basis, the state might properly release a former function in favor of "privatization" without offending civil service principles. In that case, the Legislature had authorized Caltrans to contract with private development firms to construct and operate tollways under state lease, in order to secure needed transportation systems unobtainable through public financing arrangements. The Court of Appeal upheld the statute, concluding that, although the design and construction of roads were neither new functions nor ones that state workers could not satisfactorily perform, the privatization program was an experimental one, and no state funds would be used to defray construction costs. Under these circumstances, considerations of efficiency and economy permitted an exception to the private contracting restriction. (*Id.* at pp. 593-594, and fn. 4.)

### III. *Preexisting Legislation*

From time to time before adopting Chapter 433, the Legislature had enacted provisions governing the state's authority to contract with private entities. These sections appear consistent with the decisional law interpreting article VII. (*Ante,* at pp. 548-550.) Although many of these provisions remain in effect, Chapter 433 has supplemented them. Before examining the provisions of Chapter 433, we first review the primary *preexisting* provisions, as they are pertinent to an understanding of the intent and effect of Chapter 433.

Section 14101 permits Caltrans to contract with qualified private architects and engineers if "the obtainable staff is unable to perform the particular work within the time the public interest requires such work to be done."

Former section 14130 et seq. (Stats. 1991, ch. 313, § 1.5) dealt with contracts for professional and technical services. Former section 14130, subdivision (a), set forth certain legislative findings, including: (1) recognition of a "compelling public interest" in capturing and using in a timely manner available federal, state, local, and private funds for the state highway program (former § 14130, subd. (a)(1)); (2) declaration of a need to be "plan-ready" to maximize use of these funds (former § 14130, subd. (a)(2)); and (3) recognition of a need for "additional flexibility through outside contracting" to supplement Caltrans's program staff, maintain a more stable work force, and avoid "short-term hiring and layoff" (former § 14130, subd. (a)(3)). Subdivision (b) of that section expressed the legislative intent to allow Caltrans to contract privately for professional and technical services "whenever the department is inadequately staffed to satisfactorily carry out its program [of project development] . . . in a timely and effective manner."

Section 14131 permits Caltrans to contract for services with engineers, architects, surveyors, and other similar professionals whenever certain guidelines contained in section 14134 are applicable, as long as these contracts do not displace any Caltrans employees. Section 14134, subdivision (a), sets forth guidelines that include ensuring the timely capture and use of available federal, state, and local funding, reducing "short-term fluctuations" in workload relating to project study and development, ensuring that "the cost effectiveness of contracting" is considered equally with other factors in contracting decisions, and ensuring that the contract selection process complies with state law and avoids unlawful or unfair procedures.

Section 14133, subdivision (a), provides that the "personal services contracts" provisions of section 19130 (discussed in the following paragraph)

are inapplicable to professional and technical service contracts made under section 14130 et seq.

Finally, section 19130 (which was upheld as consistent with article VII in *CSEA*, *supra*, 199 Cal.App.3d 840) governs "personal services contracts" and essentially codifies and interprets the "cost savings," "new state function," and "nature of the services" tests of the decisional law (see *ante*, at pp. 548-550), as applied to those contracts.

## IV. *Chapter 433*

Effective September 24, 1993, the Legislature adopted Chapter 433. (The provisions Chapter 433 added are effective only until January 1, 1998, unless extended.) We will paraphrase or summarize the key provisions here.

First, uncodified section 1 of Chapter 433 recites the Legislature's intent: (1) to allow Caltrans "continued flexibility" to contract privately as needed to assure timely delivery of its projects; and (2) to afford "a new and independent basis upon which to justify contracting out actions."

Next, the Legislature amended section 14130 to add additional legislative findings and declarations, including the following relevant ones:

■ Use of private "consultants" to supplement Caltrans's workforce has permitted it "to substantially enhance its project delivery," including acceleration of state highway construction projects costing nearly $1 billion. (§ 14130, subd. (a)(4).) This increase in project delivery capability "must continue in order for [Caltrans] to meet its commitments for timely project delivery," and, accordingly, a "stable contracting out program" using private consultants is needed to allow Caltrans to perform project delivery "adequately, competently, or satisfactorily." (§ 14130, subd. (a)(4).)

■ Caltrans's use of private consultants to assist in project delivery "is a new state function and does not duplicate the existing functions of the department." (§ 14130, subd. (a)(5).)

■ Caltrans may use private contracting on state highway projects funded by federal and state funds "to support state transportation infrastructure funded by local resources, to ensure timely retrofitting for seismic safety on state transportation infrastructure, and to ensure timely and cost-effective project delivery." (§ 14130, subd. (c).)

■ Caltrans "shall not be required to utilize state employees to perform all engineering and related services to the maximum extent required to meet

the goals of this article," or to hire new staff "to an internal level that matches its ability to assimilate and productively use new staff." (§ 14130, subd. (d).)

Additionally, the Legislature added sections 14130.1, providing that engineering services needed to complete the seismic safety retrofit program "shall be considered a short-term workload demand" (§ 14130.1, subd. (b)), and 14130.2, providing that engineering services needed to deliver locally financed highway projects "are not required to be considered in determining [Caltrans's] project delivery staffing needs. [Caltrans] is not required to staff at a level to provide services for other agencies." (§ 14130.2, subd. (a)(2).) Section 14130.2 also provides that Caltrans "may balance the need for outside contracting for these services on a program basis, rather than on an individual contract basis." (§ 14130.2, subd. (b).)

New section 14130.3 finds that "recent court decisions" have resulted in the termination of certain existing private contacts awarded to minority-, women-, and disabled-veteran-owned firms, a result that is inconsistent with public contracting goals. A related provision, new section 14137, declares that contracts in force or awarded before July 1, 1993, for project management services "shall not be terminated, but shall continue to the conclusion of those contracts."

As the Court of Appeal majority recognized, these provisions, though somewhat inartfully drafted, seem aimed at authorizing Caltrans's private contracting and circumventing the trial court's injunction and subsequent enforcement orders. The question before us here is whether these provisions are consistent with article VII.

## V. *The Prior Litigation*

Having reviewed the general constitutional, statutory, and decisional framework, we return to the facts of this case. In 1986, plaintiffs (a labor organization representing state engineers and a citizen/taxpayer) filed suit to enjoin Caltrans from contracting with private entities to carry out state highway projects traditionally done by state civil service employees. Following trial, on March 26, 1990, the court (Sacramento Superior Court, Eugene T. Gualco, Judge), issued an extensive statement of decision in plaintiffs' favor. The court found that since the 1986-1987 fiscal year, Caltrans has unlawfully contracted privately for engineering projects that the civil service has traditionally done; that by hiring more civil service employees, Caltrans could have the work at issue performed in a timely manner, and that Caltrans failed to justify private contracting on a cost-effectiveness or other valid basis.

The trial court also found that Caltrans undertook private contracting as a direct result of "gubernatorial/executive branch policy against the expansion of state government," which required Caltrans to "balance[] and temper[]" its requests for funding for additional staff by contracting with private entities, without regard to whether qualified persons were actually available for civil service employment or whether Caltrans could assimilate and train them in a timely manner. The court found insufficient evidence to support Caltrans's contentions that (1) its increased project workload involved short-term or temporary work that private contractors could perform most economically and efficiently, or (2) private contracting would allow Caltrans to perform its work in a more timely and effective manner than hiring new civil service staff.

Thus, on April 17, 1990, the court issued a permanent injunction prohibiting Caltrans from (1) contracting privately for engineering and inspection services for highway projects unless the work was to be performed in compliance with the then existing criteria set forth in section 14101 and former section 14130 et seq.; (2) entering into cooperative agreements with local entities when private entities were to perform part or all of the work; and (3) awarding contracts to private entities for construction survey staking.

The court's injunction also recited that Caltrans had failed to demonstrate that either (1) it could not timely perform the work by hiring additional civil service employees, or (2) private contracting was a more cost-effective way of meeting short-term peaks in its workload. Caltrans did not appeal that judgment, which is now final.

The trial court retained jurisdiction over the case to monitor Caltrans's compliance. From 1991 to 1993, the court issued additional orders implementing its injunction. One of these orders recited that because Caltrans was underestimating its actual workload and was maintaining an insufficient level of civil service staff, it needed to use private consultants to perform scheduled and unscheduled work beyond the capacity of civil service staff. The court concluded that Caltrans had violated the injunction by contracting with private entities for substantial amounts of project development work without providing adequate justification. Caltrans failed to appeal those orders.

Responding to the trial court's injunction and orders, Caltrans took some steps to minimize and phase out private contracting during fiscal year 1993-1994. It allocated funds previously authorized for private contracting to avoid disruptions of work in progress, to avert delay in projects involving

public safety, and to provide expertise unavailable through civil service. To perform the remaining project development work targeted for private consultants, Caltrans made limited term, retired annuitant, or temporary civil service appointments.

## VI. *The Present Order*

In September 1993, after the Legislature passed Chapter 433 amending and adding to section 14130 et seq., Caltrans took the position that these changes undermined the trial court's injunction and related orders and justified their dissolution. Accordingly, as the trial court found in its April 19, 1994, order, Caltrans altered its contract projections for fiscal year 1993-1994 and issued new guidelines revising its earlier plan to minimize its private contracting. Caltrans identified substantial amounts of seismic retrofitting work and reimbursed work for local agencies as eligible for private contracting in fiscal year 1993-1994. Caltrans froze the hiring of new employees, began to terminate limited term appointments, and called for a 50 percent reduction in temporary help to eliminate an assumed "overstaffed condition."

Plaintiffs, contending that Chapter 433 did not authorize Caltrans's scheduled contracting, sought an order holding Caltrans in contempt for violating the 1990 injunction. Caltrans, relying on the new provisions, asked the court to dissolve the injunction. Following briefing and argument, on April 19, 1994, the court issued its decision declining to modify or dissolve the injunction, which remains in full force.

After summarizing the prior proceedings and relevant events, the court found that Caltrans's existing and planned contracts for fiscal year 1993-1994 violated the 1990 injunction in three ways. First, Caltrans failed to justify these contracts by making a factual showing based on the criteria in former section 14130 et seq., as the injunction required. Instead, Caltrans relied solely on the new legislative findings characterizing seismic retrofitting as "short-term" work subject to private contracting (see new §§ 14130, subd. (a)(3), 14130.1, subd. (b)), on legislative directions that Caltrans not consider locally funded work in determining staffing needs (§ 14130.2, subd. (a)(2)), and on legislative encouragement of timely private contracting for state highway projects to generate maximum employment and business opportunities (§ 14130, subd. (a)(1)).

Second, the court found that, in any event, the type and amount of project development work Caltrans contracted for 1993-1994 did not correspond to that which the new provisions authorized because it fell outside the seismic

retrofitting and locally funded project categories. The court also found that Caltrans made no attempt to show these contracts satisfied the criteria for private contracting listed in section 14130.

Third, the court found that Caltrans's revised plan for contracting activity during 1993-1994 was contributing to the displacement of permanent, temporary, and part-time civil service staff. Caltrans claimed this staff reduction was needed to avoid a budget shortfall, but it was really attributable to Caltrans's preference for private contracting.

In summary, the court found that Caltrans was violating the 1990 injunction by contracting with private entities without factually demonstrating that it had met the statutory criteria for doing so. According to the court, Caltrans was displacing civil service staff from project development work that staff had historically performed and was maintaining staff at an inadequate level to create an artificial need for private contracting.

The court next considered whether anything in Chapter 433 justified Caltrans's breach of the 1990 injunction. After reviewing the new provisions at length, the court made the following findings and determinations:

(1) Contrary to new section 14130, subdivision (a)(5), project development service is *not* a new state function exempt from the constitutional restriction on private contracting, and using private contractors for project development duplicates existing state agency functions. (See *Professional Engineers, supra,* 13 Cal.App.4th at pp. 592-593; *Williams, supra,* 7 Cal.App.3d at pp. 397-399.) State civil service staff has long performed these functions.

(2) Contrary to new section 14130, subdivision (a)(4), Caltrans has not demonstrated that, because it must use private contracting to perform project delivery "adequately and competently," its actions fall within another exception to the civil service mandate. (See *Burum* v. *State Compensation Ins. Fund, supra,* 30 Cal.2d at pp. 579-582; *Riley, supra,* 9 Cal.2d at p. 135.) Any inability of civil service staff to deliver project workload on time is attributable to Caltrans's policy of inadequate staffing and reliance on private contracting.

(3) Contrary to Caltrans's contention, new section 14130.1, characterizing seismic retrofitting services as a "short-term workload demand," fails to constitute adequate justification for private contracting because it fails to consider the civil service staff available and obtainable to perform the work. The retrofit program's length "is comparable to or longer than many of the

highway projects" in Caltrans's workload and is similarly subject to unavoidable delays and unanticipated expansion in scope. Thus, merely characterizing work as "short-term" does not justify using private contractors to perform it.

(4) Contrary to Caltrans's contention, new section 14137, directing Caltrans to continue any contracts presently in force or awarded on or before July 1, 1993, is ineffective to override the court's earlier finding that certain contracts with private consultants for work during 1992-1993 did not meet the statutory criteria then in effect (former § 14130 et seq.). The new section states no facts to establish those contracts were exempt from the constitutional restriction on private contracting.

(5) New sections 14130, subdivisions (a)(1) and (d), 14130.2, subdivision (a)(2), and 14130.3, establishing various state policies favoring private contracting, are contrary to the constitutional civil service mandate because they purport to authorize Caltrans to contract privately without regard to whether available civil service staff can timely perform the services.

As the court observed, "Pursuant to the [new] provisions, [Caltrans] may calculate [its] civil service staffing needs without considering the full workload to be performed, may limit [its] procurement of civil service staff regardless of actual staffing needs or ability to productively use new staff, and [is] required to reinstate contracts for the purpose of fostering employment and business opportunities without regard to the constitutional civil service mandate. As a result, [Caltrans] purposely create[s] a need for 'a stable contracting out program' to timely deliver transportation projects, institutionalize the use of contracting in project delivery, and displace civil service employees from the function they have historically performed, in violation of article VII."

Thus, the court concluded that Chapter 433's legislative findings and directives are "obviously erroneous, unreasonable and inconsistent with the constitutional civil service mandate," and for that reason the provisions are unconstitutional to the extent they purport to authorize Caltrans to contract privately without a factual showing that the contract is permissible under applicable constitutional principles.

In its April 19, 1994, order, the court accordingly affirmed its prior 1990 injunction, stating that "[t]o the extent that [Caltrans] justif[ies its] contracts with private consultants on the basis of the provisions of Chapter 433 . . . instead of a factually supported determination pursuant to . . . sections 14131 and 14134, the contracts are invalid and [Caltrans is] in violation of the injunction." (Fn. omitted.)

## VII. *Court of Appeal Majority Opinion*

The Court of Appeal majority reversed the judgment and remanded the matter to the trial court with directions to dissolve its 1990 injunction. The court concluded that Chapter 433 contains sufficient pronouncements, directions, and safeguards to satisfy plaintiffs' earlier objections based on the private contracting restriction of article VII.

The Court of Appeal majority, after reviewing the relevant constitutional and statutory principles, initially *rejected* Caltrans's contention that new section 14130, subdivision (a)(5), makes Caltrans's use of private consultants to assist in project delivery a "new state function" exempt from the civil service mandate. (See *Williams, supra,* 7 Cal.App.3d at p. 397.) As we subsequently explain, that holding seems clearly correct in light of the uncontradicted evidence of Caltrans's historical responsibility for project development of the state highway system.

Next, the Court of Appeal majority considered and *accepted* Caltrans's alternate argument that, by reason of Chapter 433, although Caltrans's private contracting at issue here involves services that state civil service employees have traditionally done, nonetheless, it will result in greater efficiency and economy without compromising the integrity of the civil service. In so holding, the Court of Appeal relied heavily on *legislative findings and declarations* that purport to justify Caltrans's contracting activities. (See §§ 14130, 14130.1, subd. (b), 14130.3.)

In the Court of Appeal majority's view, these findings and declarations override or replace the trial court's earlier findings that Caltrans's inability to perform projects through the state civil service was caused by its own policy of inadequate staffing. As the majority opinion stated, ". . . the trial court ignored legislative findings justifying the maintenance of Caltrans's staff at levels that will not necessitate costly short-term hirings and layoffs due to workload fluctuations resulting from the volatility of funding sources." (Fn. omitted.)

The Court of Appeal relied on case law presuming the validity of legislation and according "great weight" to legislative findings unless "unreasonable and arbitrary" or "clearly and palpably wrong." (See, e.g., *Amwest Surety Ins. Co.* v. *Wilson* (1995) 11 Cal.4th 1243, 1252 [48 Cal.Rptr.2d 12, 906 P.2d 1112]; *Lockard* v. *City of Los Angeles* (1949) 33 Cal.2d 453, 461 [202 P.2d 38, 7 A.L.R.2d 990]; see also *American Bank & Trust Co.* v. *Community Hospital* (1984) 36 Cal.3d 359, 372 [204 Cal.Rptr. 671, 683 P.2d 670, 41 A.L.R.4th 233] [not proper judicial function to reweigh legislative

facts underlying statutes].) According to the Court of Appeal majority, nothing in the record supports a conclusion that the legislative findings were clearly and palpably wrong. In the majority's view, "The burden is not on Caltrans to prove the facts support the legislative determination but on plaintiffs, i.e. those who attack the statute, to prove they do not. Judicial notice of prior factual determinations of the superior court does not satisfy plaintiffs' burden inasmuch as circumstances may have changed in the interim."

Similarly, the Court of Appeal majority found "nothing in the record to support the superior court's assertion the Legislature failed to consider whether additional civil service staff could be obtained to perform the project delivery work adequately, competently or satisfactorily. The court may not simply rely on its finding preceding enactment of Chapter 433 that any inadequacy of staff was caused by a policy and practice of maintaining staff at an artificially low level. The undisputed fact remains, *as found by the Legislature*, that at the time Chapter 433 was enacted staff was inadequate to perform the work. Regardless of the reasons why this condition had existed, the Legislature was not precluded from legislating based on then-existing circumstances. There is nothing in the record to refute *the implicit legislative finding* that sufficient additional staff could not be obtained on a cost-effective basis." (Italics added, fn. omitted.)

Responding to the trial court's doubts regarding the supposed "short-term" nature of the seismic safety retrofit program, the Court of Appeal majority reasoned that, although this program may be comparable to any typical Caltrans project, it "has a finite life. Presumably, after all bridges are retrofitted as needed, the program will terminate. Thus it is not unreasonable for the Legislature to find it would be more economical to contract out such work than to hire additional staff who must then be laid-off when the short-term retrofit program is completed."

The Court of Appeal next addressed the trial court's conclusion that section 14137 (directing Caltrans to continue contracts in force or awarded on or before July 1, 1993) is invalid because it purports to override the court's injunction without stating facts establishing the contracts at issue satisfied the civil service mandate. According to the Court of Appeal majority, the new section *by itself* satisfied Caltrans's earlier failure of proof: "In section 14137, the Legislature has found the facts and circumstances justify each of the designated contracts. *In effect, the Legislature has relieved Caltrans of the burden of presenting evidence to justify the individual contracts.* In so doing, the Legislature has not overridden the superior court's

earlier determination *but has supplied the factual basis the superior court determined was lacking.* Consistent with the previously discussed rules of judicial review of legislative enactments, we presume the facts and circumstances support the Legislature's implied findings absent contrary evidence." (Italics added.)

Relying on *CSEA, supra,* 199 Cal.App.3d at pages 851 through 853, the Court of Appeal majority reasoned that the Legislature properly could find that, under present conditions, certain highway construction projects, even though existing state functions, cannot be performed "adequately, competently or satisfactorily" by state employees, but can be performed "efficiently and economically" if privately contracted. "This is entirely consistent with the civil service mandate, a key purpose of which is to encourage efficiency and economy in state government. [Citation.]"

Accordingly, the Court of Appeal majority concluded that Chapter 433 is constitutional "on its face," reserving the question whether its provisions are "now or will be applied constitutionally." The court also concluded that the Caltrans activities that the trial court's 1990 injunction prohibited "appear to be consistent with the objects and purposes of [Chapter 433] as set out expressly in legislative findings and declarations, the underlying factual bases of which were not competently challenged in the superior court. As such, they may not be enjoined absent a showing the statute is improperly applied contrary to its terms or in derogation of the civil service mandate." The Court of Appeal ordered the 1990 injunction dissolved and the matter remanded to the trial court for further proceedings.

### VIII. *The Court of Appeal Dissent*

Justice Blease wrote a lengthy dissent. He preceded his analysis with this succinct, and we believe accurate, description of the private contracting restriction in article VII: "History has shown that patronage hiring of public employees corrupts the political process, leads to waste, and depletes the quality of the public workforce. The People enacted article VII to avoid this. Early on the California Supreme Court recognized that the civil service provisions will not work if the merit appointment system can be circumvented by simply contracting out civil service jobs."

The dissent reviewed the history of the proceedings in this case and observed that, "[u]nable to make headway with the judicial branch's tiresome requirement that Caltrans produce evidence that contracting out was warranted as cheaper or more efficient, Caltrans sought a sanction from the Legislature for its practice of contracting out. The result is Chapter 433."

In the dissent's view, the Court of Appeal majority relied exclusively and improperly on an *implied* legislative finding of cost-effectiveness to permit Caltrans to resume private contracting without requiring it to prove that contracting is more economical or efficient than using state civil service employees. The dissent observed that in reaffirming its 1990 injunction, the trial court found that Caltrans's " 'contracting activity during 1993-94 is contributing to the displacement of permanent, temporary and part-time civil service staff in the performance of project development work.' " According to the dissent, Caltrans did not challenge this new finding, but has relied *entirely* on the provisions of Chapter 433.

The dissent believed that "[t]he majority would permit contracting out without adherence to any of the safeguard criteria developed in the case law. This total break with precedent is not warranted by Chapter 433. It is questionable whether a statute constitutionally could expressly bar the application of these safeguards. . . . [¶] It would raise serious constitutional questions if we construed a statute to bar the safeguards against patronage developed in the case law, including the safeguard that the state be prepared to *prove* in a judicial forum that contracting out is warranted by considerations of economy or efficiency. The case law is grounded in a constitutional provision enacted to overcome a pernicious tendency inherently afflicting *both* of the political branches of the government.

"However, this question is not presented by Chapter 433. No provision of Chapter 433 alters the traditional burden of proof that the government show that contracting out is warranted by considerations of economy or efficiency. Accordingly, there is no valid basis for a claim that Chapter 433 conflicts with the injunction because it imposes this burden upon the state." (Fns. omitted.)

The dissent next analyzed the four principal substantive changes in Chapter 433 on which the majority relied as allowing Caltrans to contract various work privately without proof of cost savings or added efficiency. In the dissent's view, each statutory change conflicts with the earlier findings and conclusions in the trial court's injunction and orders. As the dissent explained, "The trial court had determined the rights and obligations of the parties to this litigation under contracts entered into under the law preceding Chapter 433. The state did not appeal and the decision is final. The conclusion is inescapable that the Legislature has encroached upon the judicial power because it seeks to undo a final judicial determination of those rights and obligations."

The dissent next addressed the majority's claim that legislative findings in Chapter 433 included an implied finding that private contracting would

permit Caltrans to operate more efficiently and cost-effectively than hiring state workers. The dissent disagreed, stating that "We are bound by the trial court's factual determination that the necessity to contract out, if any, arises out of an artificial, political constraint on the hiring of new civil service staff. In the many proceedings which produced the injunction and enforcement, Caltrans, the administrative agency which is the necessary source of evidence that contracting out is cost-effective, has been unable to provide any such evidence. How then could we plausibly imply that the Legislature in enacting Chapter 433 made an implied finding that contracting out is cost-effective? If the Legislature predicated Chapter 433 on such a finding how could it fail to assert this among the plethora of cryptic, illogical, and untenable express findings and declarations?"

## IX. *Discussion*

■ As the Court of Appeal majority recognized, granting, denying, dissolving, or refusing to dissolve a permanent or preliminary injunction rests in the sound discretion of the trial court upon a consideration of all the particular circumstances of each individual case, and the trial court's judgment will not be modified or dissolved on appeal except for an abuse of discretion. (*Salazar* v. *Eastin* (1995) 9 Cal.4th 836, 850 [39 Cal.Rptr.2d 21, 890 P.2d 43] (*Salazar*).) Recent legislation authorizes a court to modify or dissolve an injunction or temporary restraining order "upon a showing that there has been a material change in the facts upon which the injunction or temporary restraining order was granted, that the law upon which the injunction or temporary restraining order was granted has changed, or that the ends of justice would be served by the modification or dissolution of the injunction or temporary restraining order." (Code Civ. Proc., § 533; accord, Civ. Code, § 3424, subd. (a) [grounds for modifying or dissolving "final injunction"]; see also *Salazar*, *supra*, 9 Cal.4th at p. 850 [court has inherent power to vacate an injunction upon a showing of a change in controlling law].)

In *Salazar*, the trial court's injunction was based on "assumptions about the law" that changed when this court filed a new decision. Because the injunction was inconsistent with the new law, the trial court did not abuse its discretion in vacating it. (See *Salazar*, *supra*, 9 Cal.4th at p. 850.) Thus, the principal question before us is whether the trial court abused its discretion in failing to modify or dissolve its earlier injunction in light of Chapter 433's subsequently adopted legislative findings and determinations.

Caltrans raises the preliminary question whether we should overrule the substantial body of case law holding that article VII restricts private contracting and in this manner free Caltrans from its obligations under the 1990

injunction. As will appear, we conclude that no proper ground exists for overruling the private contracting restriction of prior case law, that the provisions of Chapter 433 on which Caltrans relies conflict with the constitutional principles of this case law, and that, accordingly, the trial court did not abuse its discretion in declining to modify or dissolve its earlier injunction.

### A. *Overruling Riley and its progeny*

Caltrans first urges us to reconsider and overrule or disapprove the "archaic" *Riley* decision and the subsequent decisions of this court and the Court of Appeal that have applied, extended, or confined its rule in various contexts. As Caltrans graphically puts it, "[t]he incoherent, unworkable, and potentially crippling tests which encrust and distort article VII are not even hinted at by its language." Caltrans correctly observes that the private contracting restriction and its exceptions do not appear in the bare language of article VII but derive from judicial interpretation regarding the logical implications of the constitutional provisions. (See *CSEA, supra,* 199 Cal.App.3d at p. 844.)

In Caltrans's view, *Riley* erred in inferring from California Constitution, former article XXIV, the predecessor of article VII, that the state is prohibited from using "independent contractors" except in narrow, exceptional situations. According to Caltrans, former article XXIV was simply intended to restrict appointments and promotions *in state service* except on the basis of merit and competitive examination, in order to avoid favoritism and the "spoils system" in selecting among *existing state employees.* Caltrans cites various sources in support of its position that the constitutional civil service mandate was not intended to restrict private contracting. For example, the ballot arguments favoring the adoption of the original civil service mandate in 1934 referred to its purpose "to prohibit appointments and promotion *in State service* except on the basis of merit, efficiency and fitness ascertained by competitive examination." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 6, 1934), argument in favor of Prop. 7, p. 12, italics added.)

In *Riley,* we considered and rejected this precise argument, concluding that the civil service mandate does not distinguish between "employees" and "independent contractors," but is more concerned with whether the civil service staff could perform the services involved. (*Riley, supra,* 9 Cal.2d at p. 135; accord, *Burum* v. *State Compensation Ins. Fund, supra,* 30 Cal.2d at pp. 579-580.) As an analytical matter, *Riley*'s rule seems appropriate to

assure that the state civil service is not neglected, diminished, or destroyed through routine appointments to "independent contractors" made solely on the basis of political considerations or cronyism. (See *Williams, supra,* 7 Cal.App.3d at p. 397 [*Riley* rule "emanates from an implicit necessity for protecting the policy of the organic civil service mandate against dissolution and destruction"]; *CSEA, supra,* 199 Cal.App.3d at pp. 846-847 [dual purposes of article VII are to promote efficiency and economy in state government, and to eliminate the " 'spoils system' " of political patronage]; see also Comment, *Contracting With the State Without Meeting Civil Service Requirements* (1957) 45 Cal.L.Rev. 363, 364 ["The inclusion of independent contractors is of vital importance as it cuts off a wide area of possible subversion of the civil service system."].)

As plaintiffs observe, "Were the rule otherwise, the civil service system could be entirely undone by a system of contracting; and the state's work force could be dominated by independent contractors who would be hired from job to job." Such a system, operating without regard to considerations of economy or efficiency, and open to a "patronage/spoils system" method of contracting, would conflict with the electorate's probable intent in adopting article VII and its predecessor.

Moreover, even assuming for the sake of argument that *Riley*'s constitutional interpretation was originally flawed, under settled rules of construction we must presume that *Riley*'s interpretation was preserved and reincorporated into the Constitution on two subsequent occasions when (1) in 1970, the voters reenacted an amended version of former article XXIV pursuant to the recommendation of the California Constitution Revision Commission, and (2) in 1976, the voters adopted the substance of former article XXIV as new article VII. (See *Sarracino* v. *Superior Court* (1974) 13 Cal.3d 1, 8 [118 Cal.Rptr. 21, 529 P.2d 53] [adoption of constitutional language similar to that in former constitutional provision is presumed to incorporate authoritative judicial construction of former language]; cf. *In re Harris* (1989) 49 Cal.3d 131, 136 [260 Cal.Rptr. 288, 775 P.2d 1057] [drafters of initiative measure, and voters adopting it, are deemed to know judicial construction of law serving as its source].)

In this connection, we note that in 1966, in summarizing its recommendations with regard to the proposed revision of former article XXIV, the California Constitution Revision Commission stated: "The first question discussed in considering Article XXIV was whether the matters treated in the article, and particularly the enumeration of exemptions [from civil service] in Section 4, ought to be retained in the Constitution. It was

concluded that California has one of the best civil service systems in the nation and that constitutional treatment of the basic elements of the system is essential to insure continuance of its high quality. It was recognized, for example, that the alternative of placing the entire exemption power with the Legislature would [subject] the legislators to unduly severe pressures to carve out various exceptions to the application of civil service laws and that much strain on the integrity and efficacy of the civil service system could result." (Cal. Const. Revision Com., Proposed Revision (1966) p. 109.)

Thus, the California Constitution Revision Commission considered and rejected an approach that would have given the Legislature open-ended authority to create exemptions from civil service in any area in which the Legislature felt that public policy would be served better by an alternative to the civil service system. We believe this "legislative history" of the current civil service provisions of the California Constitution supports both the retention of the constitutional principle established in *Riley* and our conclusion that the principle embodied in *Riley* operates to constrain the actions of the Legislature as well as of the executive branch.

Caltrans likewise criticizes *Riley*'s progeny and the creation of such extensions or modifications as the "new state function" rule (see *Williams, supra,* 7 Cal.App.3d at pp. 397-399) and the "cost savings" rule (see *CSEA, supra,* 199 Cal.App.3d at pp. 851-853). In Caltrans's view, the rules these cases announce are unsupported by the bare language of the civil service mandate and constitute further judicial legislation. Assuming *Riley*'s premise is correct, however, and the Constitution indeed limits private contracting, these subsequent cases seem reasonable, practical interpretations of the general constitutional provision. As we explained in a case interpreting another constitutional measure, ". . . we deal with a constitutional provision [Cal. Const., art. XIII A] of a kind, similar to many others, which necessarily and over a period of time will require judicial, legislative and administrative construction. This is a fairly common procedure." (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 244 [149 Cal.Rptr. 239, 583 P.2d 1281].) Moreover, ". . . California courts have held that constitutional and other enactments must receive a liberal, practical common-sense construction which will meet changed conditions and the growing needs of the people. [Citations.]" (*Id.* at p. 245.)

Caltrans asserts supposed policy reasons why we should overrule or disapprove 60 years of settled case law: "As a result [of the existing case law], Californians have had to forego promising new techniques for providing services, ranging from contracting with private contractors to outright

privatization. This has made more expensive by possibly billions of dollars the delivery of services in California. It also puts lives at risk. For example, the inability to use private engineering firms would threaten the timely completion of the seismic retrofit of California bridges and overpasses."

First, although these reasons, if factually based, might support a constitutional amendment to clarify, or indeed abrogate, the private contracting restriction, they offer no solid ground for ignoring traditional principles of stare decisis. (See, e.g., *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 296-297 [250 Cal.Rptr. 116, 758 P.2d 58].) Caltrans points to no new legal developments, such as scholarly criticism or commentary, or contrary case law in other states, that would cast doubt on the continued vitality of *Riley* and its progeny. Although Caltrans asserts that many other states allow private contracting, our review of the sister state decisions indicates that, like California, most of these states have substantial restrictions and "efficiency and economy" requirements to protect their civil service systems from deterioration through private contracting. (See, e.g., *Hall* v. *City of Tuscaloosa* (Ala. 1982) 421 So.2d 1244, 1249; *Moore* v. *State, Dept. of Transp.* (Alaska 1994) 875 P.2d 765, 768-773; *Colorado Ass'n of Pub. Emp.* v. *D.O.H.* (Colo. 1991) 809 P.2d 988, 992-998; *Jack A. Parker & Assoc., Inc.* v. *State, etc.* (La.Ct.App. 1984) 454 So.2d 162, 165-167; *Michigan State Employees* v. *Civil Service Com'n* (1985) 141 Mich.App. 288 [367 N.W.2d 850, 852]; *University of Nevada* v. *State Employees Ass'n, Inc.* (1974) 90 Nev. 105 [520 P.2d 602, 604-607]; *Nassau Educ. Chap.* v. *Great Neck U. Free Sch.* (1981) 85 A.D.2d 733 [445 N.Y.S.2d 812, 813]; *Carter* v. *Ohio Dept. of Health* (1986) 28 Ohio St.3d 463 [504 N.E.2d 1108, 1109-1110]; *Local 4501, Comm. Workers* v. *Ohio State Univ.* (1984) 12 Ohio St.3d 274 [466 N.E.2d 912, 914-915]; *Stump* v. *Dept. of Labor & Industry* (1993) 154 Pa.Commw. 471 [624 A.2d 229, 231]; *Teamsters Local 117* v. *King County* (1994) 76 Wn.App. 18 [881 P.2d 1059, 1061-1062]; *Wash. Fed., etc.* v. *Spokane Community Coll.* (1978) 90 Wn.2d 698 [585 P.2d 474, 475]; see also Kaplan, The Law of Civil Service (1958) pp. 98-99; Becker, *With Whose Hands: Privatization, Public Employment, and Democracy* (1988) 6 Yale L. & Pol'y Rev. 88, 99-103; Comment, *Contracting With the State Without Meeting Civil Service Requirements, supra,* 45 Cal.L.Rev. at pp. 364-365; Note, *State Civil Service Law—Civil Service Restrictions on Contracting Out by State Agencies* (1980) 55 Wash. L.Rev. 419, 434-435, fns. 76-84, and cases cited *(Civil Service Note).)*

Caltrans acknowledges that although the federal government "actively encourages" private contracting, applicable legislation calls for "policies, procedures, and practices which will provide the Government with property and services of the requisite quality, within the time needed, *at the lowest*

*reasonable cost.*" (41 U.S.C. former § 401(2), italics added; see *Diebold* v. *U.S.* (6th Cir. 1991) 947 F.2d 787, 789 [federal procurement rules require agencies to acquire goods and services *at lowest possible cost* to taxpayer].)

In short, the *Riley* decision and its progeny seem typical of the restraints many other jurisdictions, including the federal government, have imposed on private contracting. The single critical commentary Caltrans cited was directed toward a State of Washington decision, *Wash. Fed., etc.* v. *Spokane Community Coll., supra*, 585 P.2d 474, enforcing Washington's civil service "merit system" legislation to invalidate a private contract *despite a substantial cost savings to the state.* (See *Civil Service Note, supra*, 55 Wash. L.Rev. 419.) The student commentator proposed a modified rule that would permit private contracting in good faith to achieve "improved economy." (*Id.* at p. 440.) As we have seen, the California courts already permit private contracting if cost savings justify it and other applicable civil service standards are met. (*CSEA, supra*, 199 Cal.App.3d at pp. 851-853.)

Caltrans suggests that the "nature of the services," and "new state function" tests are difficult to apply and can lead to anomalous results. But Caltrans fails to offer any alternatives short of simply abrogating the private contracting restriction in its entirety. We are not prepared to take that step and disregard three decades of jurisprudence applying and construing the constitutional provision.

Second, Caltrans overstates its case substantially in claiming that *Riley* and its progeny's undue restrictions on private contracting or privatization threaten fiscal responsibility and public safety. As we have seen, applicable case law allows the state to contract privately if the civil service is unable to perform the work "adequately and competently." (*Riley, supra*, 9 Cal.2d at p. 135.) This broad and flexible exception clearly includes the expense and safety considerations Caltrans cites.

As the amicus curiae brief of various county transportation agencies correctly observes, *Riley*'s test "is broad enough to permit contracting out where the nature of the task is such that the civil service could not perform the task efficiently, or quickly enough, or with the same degree of skill. There is nothing in *Riley* to suggest that personnel shortages, earthquakes, economic efficiencies, new state functions, higher skills, etc., would not be within the meaning of this exception."

Additionally, nothing in the record supports Caltrans's assertions that restrictions on private contracting cause additional expense or safety risks. As plaintiffs observe, ". . . there is no evidence in the record to support

Caltrans' bare claim that the use of contracts 'results in faster and less expensive service delivery.' [Citation.] Caltrans never even contended such in the trial court, much less produced any evidence showing such to be the case [citation]." (Fn. omitted.)

Finally, as we have explained, contrary to Caltrans's assumption, the civil service mandate does not preclude outright privatization of an existing state function. (*Professional Engineers, supra,* 13 Cal.App.4th at pp. 593-595, and fn. 4.) That case involved the total withdrawal of a state function on an experimental basis, requiring no expenditure of state funds. Similar experimentation may be permissible under article VII, if justified by considerations of economy and efficiency and if otherwise consistent with applicable civil service requirements, despite the use of state funding. (See *CSEA, supra,* 199 Cal.App.3d at pp. 844-846.) The present case involves no withdrawal of a state function, however, and as will appear, the provisions of Chapter 433 are too far-reaching in scope to qualify as an "experiment."

Finding that none of Caltrans's policy arguments favoring reconsideration of *Riley* has substantial merit, we therefore decline to overrule or disapprove *Riley* and its progeny.

## B. *Effect of Chapter 433*

 We turn then to the question whether Chapter 433 affords an independent basis for overturning the trial court's injunction and enforcement orders. Preliminarily, we observe that the trial court's injunction of April 17, 1990, has become final, and it binds the parties to this litigation *unless* Chapter 433 provides ground for dissolving it. As we have frequently explained, the collateral estoppel doctrine precludes relitigation of an issue previously adjudicated by final judgment between the parties. (See, e.g., *Producers Dairy Delivery Co. v. Sentry Ins. Co.* (1986) 41 Cal.3d 903, 910 [226 Cal.Rptr. 558, 718 P.2d 920].) Caltrans has never challenged the trial court's earlier findings and conclusions regarding its noncompliance with the private contracting restriction. Apart from seeking to abrogate *Riley* et al., Caltrans raises no challenges independent of Chapter 433 at this time. We therefore limit our present discussion to the effect of Chapter 433 on the trial court's injunction and subsequent enforcement orders.

### 1. *No express or implied legislative findings justify vacating the injunction*

 As the Court of Appeal dissent observes, Chapter 433 contains no express or implied legislative findings that would justify vacating the trial court's injunction. By adopting Chapter 433, the Legislature has made clear

it *prefers* private contracting in the areas it mentioned, but legislative preference affords no proper ground for excusing a *constitutional* violation that a trial court's final judgment previously enjoined. ■ Although courts must give legislative findings great weight and should uphold them unless unreasonable or arbitrary, ". . . we also must enforce the provisions of our Constitution and 'may not lightly disregard or blink at . . . a clear constitutional mandate.' [Citation.]" (*Amwest Surety Ins. Co.* v. *Wilson, supra,* 11 Cal.4th at p. 1252, quoting from *California Housing Finance Agency* v. *Elliott* (1976) 17 Cal.3d 575, 591 [131 Cal.Rptr. 361, 551 P.2d 1193]; see also *Spiritual Psychic Science Church* v. *City of Azusa* (1985) 39 Cal.3d 501, 514 [217 Cal.Rptr. 225, 703 P.2d 1119] [ordinary deference courts owe to legislative action vanishes when constitutionally protected rights are threatened].) As stated in the context of a First Amendment challenge to federal legislation, ". . . the deference afforded to legislative findings does 'not foreclose [a court's] independent judgment of the facts bearing on an issue of constitutional law.' [Citations.] This obligation . . . is to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence. [Citation.]" (*Turner Broadcasting System, Inc.* v. *FCC* (1994) 512 U.S. 622, 666 [114 S.Ct. 2445, 2471, 129 L.Ed.2d 497] (lead opn. of Kennedy, J.).)

■ Does Chapter 433 contain factually supported findings that would excuse noncompliance with the civil service mandate? In our view, none of the express or implied provisions of Chapter 433 affords a legitimate basis for disregarding the constitutional restriction on private contracting. Of course, the Legislature clearly intended Chapter 433 to expand Caltrans's ability to make these contracts. Thus, an August 1993 report of the Assembly Committee on Transportation states that although "existing law" requires Caltrans to show the inadequacy of existing and recruitable staff to complete project development, Chapter 433 "would specify that Caltrans is not obligated to meet that or any other test relative to hiring to assimilation and productive use of civil service employees, and instead, can contract out at the discretion of the director." (Assem. Com. on Transportation, Rep. on Sen. Bill No. 1209 (1993-1994 Reg. Sess.) as amended July 14, 1993, p. 3.) In the absence of any substantial evidence supporting this legislative intent to accommodate Caltrans in circumventing the court's injunction, we must deem this purpose, however clearly expressed, insufficient to satisfy the constitutional mandate. Significantly, the same legislative report frankly acknowledged that, because the proposed legislation purported to expand by statute the authority for private contracting, "questions" had been raised regarding its constitutionality, and it was "unclear" what effect, if any, the proposed legislation would have on this contracting. (*Id.* at p. 4.)

The trial court found no facts to support a finding that civil service staff would be unable "adequately and competently" to perform the work at issue. According to the court, this finding could only be based on a study of actual workloads and available staff during particular fiscal years. Caltrans submitted no such study, and the available evidence (involving pre-1993 fiscal years) supported a contrary finding.

Most provisions of Chapter 433 appear intended to dispense with, rather than to satisfy, the constitutional civil service mandate. Thus, section 14130, subdivision (d), purports to relieve Caltrans from its obligations (1) to use state employees to perform engineering and related services "to the maximum extent required to meet the goals of this article," and (2) "to staff at an internal level that matches its ability to assimilate and productively use new staff." As the Court of Appeal dissent indicates, this provision seems to contemplate Caltrans's use of private contracting even if it is able to use new civil service employees productively. No express or implied finding and no evidentiary support exist to sustain such a provision.

Similarly, section 14130.2, subdivision (a)(2), purports to relieve Caltrans of its obligation to maintain a civil engineering staff "at a level to provide services for other [local] agencies" that arrange their own financing for state highway projects. As the Court of Appeal dissent observed, this provision also seems to conflict with the constitutional civil service mandate by authorizing Caltrans to contract work privately on locally funded projects "even if additional civil service staff could be hired to perform it as cheaply and as promptly."

In like manner, section 14130.1, which deems engineering services for the seismic safety retrofit program a "short-term workload demand," is aimed, according to the Court of Appeal majority, at relieving Caltrans from its obligation to have its civil service staff perform this work. Plaintiffs observe that this "finding" is both factually unsupported and irrational, as every highway project could be deemed "short term" in the sense that it has a finite term lasting until it is completed. In any event, as the Court of Appeal dissent notes, this "cryptic" provision contains no basis for modifying the trial court's injunction.

Section 14137, which purports to revive Caltrans's preexisting contracts despite the trial court's injunction, contains no express or implied findings that might satisfy the civil service mandate. A related provision, section 14130.3, indicates that one purpose of section 14137 was to reinstate contracts awarded to minorities, women, or disabled veterans, but section 14137

is not limited to these contracts. As the Court of Appeal dissent notes, that legislative purpose may be exemplary, but it does not afford a proper ground for noncompliance with the civil service mandate.

Both the Court of Appeal majority and dissent agree that, despite the Legislature's characterization (see § 14130, subd. (a)(5)), state highway project development is not a "new state function" within the exception recognized by *Williams, supra*, 7 Cal.App.3d at page 397. As the Court of Appeal majority correctly observes, "Notwithstanding the Legislature's finding to the contrary, Caltrans's own description of the activities authorized by Chapter 433 discloses they do not constitute a new state function but simply a new technique for performing an existing function. As Caltrans readily concedes, it has always been responsible for project development of state highway projects. Under the statute as revised in Chapter 433, the state remains responsible for financing and controlling all project development work covered by section 14130 et seq. Chapter 433 simply expands Caltrans's power to contract with private entities to perform that work. We cannot accept Caltrans's legal conclusion that an 'enriched' blend of private contracting to meet responsibilities historically discharged by Caltrans employees creates a 'new state function' within the meaning of that test as explicated in . . . *Williams, supra*, 7 Cal.App.3d 390."

Only one provision of Chapter 433 appears drafted with a view toward demonstrating compliance with *Riley*. Section 14130, subdivision (a)(4), recites that private contracting has helped "accelerate[] nearly one billion dollars ($1,000,000,000) worth of construction projects on the state highway system. This significant increase in project delivery capability must continue in order for the department to meet its commitments for timely project delivery." The section then contains the legislative conclusion that "Without the ability to continue a stable contracting out program, . . . the department will not be able to perform project delivery adequately, competently, or satisfactorily, thereby necessitating the use of private consultants to supplement its in-house staff."

The Court of Appeal majority recognized that the foregoing conclusion is "illogic[al]," in that it states the tautology that private contracting is necessary to avoid private contracting. Yet, as the majority also notes, the section does appear to "find" private contracting necessary to permit Caltrans to perform its project delivery in a timely manner.

Plaintiffs observe, however, that the trial court found Caltrans created an artificial "need" for private contracting that resulted from its practice of

maintaining an inadequate level of civil service staff, rather than from any legitimate lack of available or obtainable qualified personnel. As explained below (*post*, pt. IX.B.2.), the Legislature cannot simply override this factual finding by issuing a general legislative declaration that purports to cover the entire area of private contracting. Of course, under *Riley*, Caltrans has had and continues to have the opportunity to justify *specific* private contracts on the basis that they are needed to assure timely project delivery unobtainable through the available state civil service.

We conclude that Chapter 433 contains no express or implied findings sufficient on their face to justify dissolving the trial court's injunction. To the extent Chapter 433's provisions conflict with the civil service mandate, they are invalid.

2. *Factually unsupported legislative findings cannot supplant the findings incorporated in a final court judgment*

Even were we to conclude, for purposes of argument, that Chapter 433 contains express or implied findings to the effect that Caltrans is unable to perform the services in question "adequately and competently" through civil service, or that private contracting has resulted and will result in substantial cost savings or other significant advantages to the state, these findings, standing alone and without any apparent evidentiary or empirical support, would be insufficient to supplant the trial court's express findings to the contrary.

Caltrans, adopting the Court of Appeal majority's similar argument, contends that ". . . the legislative findings themselves are . . . proof . . ." of the propriety of private contracting sufficient to sustain the new legislation, and that the trial court's own contrary findings "are trumped by more recent legislative findings of fact," which "have to be respected unless palpably wrong." Clearly, however, something more is needed to "trump" a trial court's specific findings of fact and *final* adjudication of a constitutional violation of article VII than bare legislative declarations. Neither the Legislature nor the courts can satisfy article VII by the mere expediency of adopting unsubstantiated findings that purport to sustain or create an exception to the constitutional provision. As we stated in *Riley*, " 'The Legislature is prohibited from exempting any group from the merit system of employment . . . .' [¶] . . . This court is without power to create additional exceptions by implication." (*Riley, supra*, 9 Cal.2d at p. 134.)

Thus, as previously explained (*ante*, at pp. 568-569), legislative findings purporting to contradict or abrogate express judicial findings of fact evidencing a violation of a constitutional mandate such as article VII are subject to

our independent review to determine whether they reasonably support a contrary determination. Legislative findings based on evidence elicited at committee hearings or derived from extensive factual studies logically would be entitled to more weight than findings included in legislation solely to accommodate a litigant's request for relief.

Our review of the legislative history underlying the adoption of Chapter 433 fails to indicate that the Legislature conducted any factual studies or evidentiary hearings before adopting that measure. Certainly, Caltrans points to no studies submitted to the Legislature indicating that private contracting would save the state time or money in project development. Indeed, one study plaintiffs submitted to the trial court indicated that the cost of private contracting was substantially *greater* than the cost of using civil service staff. Caltrans acknowledges that this study showed the cost of one personnel year for a state employee to be $70,000 to $75,000, while the cost of a private consultant was $138,000.

Caltrans relies in part on the August 1993 Assembly Committee on Transportation report indicating that the cost-effectiveness of contracting for professional services "is a hotly disputed topic" and commenting briefly on Caltrans's improved "project delivery" (resulting, as the trial court found, from Caltrans's deliberate failure to maintain an adequate civil service staff) (Assem. Com. on Transportation, Rep. on Sen. Bill No. 1209 (1993-1994 Reg. Sess.) as amended July 14, 1993, p. 4; see *ante*, at p. 570) and a letter from the Legislative Analyst to a state senator indicating that figures purporting to show the respective costs of private and public service "are not directly comparable." (Legis. Analyst, letter to Sen. Marian Bergeson (July 15, 1993) p. 1.) Caltrans also cites a report of the Senate Transportation Committee referring to various conflicting evaluations and studies on the subject of the cost-effectiveness of private contracting (Sen. Transportation Com., Rep. on Sen. Bill No. 1209 (1993-1994 Reg. Sess.) as amended June 24, 1993) and a Senate Appropriations Committee fiscal summary referring to a study finding "no significant difference" in cost (Sen. Appropriations Com., Fiscal Summary of Sen. Bill No. 1209 (1993-1994 Reg. Sess.) as amended June 24, 1993).

Conspicuously absent from the legislative materials are any studies, reports, or testimony that would contradict the trial court's specific fact findings regarding the absence of affirmative proof of any cost savings or other justification for private contracting. The few studies Caltrans does cite appear largely inconclusive regarding the cost-effectiveness of private contracting. In any event, Caltrans fails to indicate whether these studies were

presented to the trial court or the Legislature. Accordingly, they have little relevance here.

As Caltrans observes, in an uncodified section of Chapter 433 (§ 13), the Legislature authorized a *future* study to compare civil service and private contracting costs to help determine the most economical mix of public and private service provision. The results of this study could well assist Caltrans in convincing the trial court to modify its injunction. But until such a study is performed, we have no basis for concluding that Chapter 433's legislative findings have undermined the injunction.

We also observe that, by its very nature, the civil service mandate does not readily lend itself to broad legislative exemptions. Rather, courts should usually apply the tests *Riley* and its progeny devised on a case-by-case basis, evaluating *particular contracts* rather than entire areas of operation such as "engineering" or "project development." Of course, nothing in this opinion would prevent Caltrans from seeking modification of the 1990 injunction based on a showing that particular contracts are justified because state workers cannot perform the work "adequately and competently," or as economically, or because the work calls for the performance of new state functions.

In light of our conclusion that Chapter 433 affords no basis for modification of the trial court's injunction, we need not reach plaintiffs' further argument that Chapter 433 is invalid as a violation of separation of power principles. (See Cal. Const., art. III, § 3; *Mandel* v. *Myers* (1981) 29 Cal.3d 531, 547-549 [174 Cal.Rptr. 841, 629 P.2d 935]; *Serrano* v. *Priest* (1982) 131 Cal.App.3d 188, 200-201 [182 Cal.Rptr. 387].)

CONCLUSION

We conclude that *Riley* and its progeny are consistent with article VII's civil service mandate. These decisions are reasonable, practical ones aimed at preserving the state's civil service from dissolution or decay without unduly hampering state agencies such as Caltrans from private contracting whenever the circumstances reasonably justify it. We further conclude the trial court properly found Chapter 433's legislative findings and declarations provided insufficient basis for modifying its 1990 injunction.

The judgment of the Court of Appeal is reversed.

George, C. J., Mosk, J., Kennard, J., and Benke, J.,* concurred.

**BAXTER, J.,** Dissenting.—The majority find chapter 433 of Statutes 1993 (Chapter 433) violative of the state Constitution's civil service provision (Cal. Const., art. VII, § 1), as interpreted by *State Compensation Ins. Fund* v. *Riley* (1937) 9 Cal.2d 126 [69 P.2d 985, 111 A.L.R. 1503] and subsequent decisions. In the majority's view, the legislative determinations supporting the 1993 enactment of Chapter 433 are insufficient to supplant court findings incorporated in a 1990 judgment which were never challenged on appeal. (Maj. opn., *ante*, at pp. 572-574.)

I respectfully dissent. In my judgment the majority, although purporting to follow settled rules, in fact apply a totally unprecedented standard for invalidating Chapter 433 without offering any justification or rationale for rejecting a century of decisional law in California. In so doing, the majority overstep the clearly marked boundaries delimiting the judicial function and radically alter the balance of power between the coordinate branches of government.

When properly viewed, Chapter 433 represents a constitutionally valid effort by the Legislature to encourage private contracting in furtherance of the objectives of efficiency and economy in state government. In holding otherwise, the majority inappropriately substitute their judgment for that of the Legislature and improperly limit the Department of Transportation's (Caltrans's) opportunities to take advantage of private sector efficiencies.

I.

Before today the rules mandating judicial deference to legislative enactments were firmly established. As Justice Ardaiz elaborates in his dissent, decisions dating back to the turn of the century require the courts to always presume that the Legislature acts with integrity and with an honest purpose to keep within constitutional restrictions and limitations. (*Beach* v. *Von Detten* (1903) 139 Cal. 462, 464-465 [73 P. 187]; cf. *Miller* v. *Municipal Court* (1943) 22 Cal.2d 818, 828 [142 P.2d 297].) "[U]nder the doctrine of separation of powers neither the trial nor appellate courts are authorized to 'review' legislative determinations." (*Lockard* v. *City of Los Angeles* (1949) 33 Cal.2d 453, 461-462 [202 P.2d 38, 7 A.L.R.2d 990].) Thus, the Legislature's determination of the facts warranting its action " 'must not be set aside

---

*Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

or disregarded by the courts, unless the legislative decision is clearly and palpably wrong and the error appears beyond reasonable doubt from facts or evidence which cannot be controverted, and of which the courts may properly take notice.' "[1] (*Lockard* v. *City of Los Angeles, supra,* 33 Cal.2d at p. 461, quoting *Matter of Application of Miller* (1912) 162 Cal. 687, 696 [124 P. 427]; *Barenfeld* v. *City of Los Angeles* (1984) 162 Cal.App.3d 1035, 1040 [209 Cal.Rptr. 8].) In other words, legislative determinations are not to be judicially nullified unless they are manifestly unreasonable, arbitrary or capricious. (*Amezcua* v. *City of Pomona* (1985) 170 Cal.App.3d 305, 309-310 [216 Cal.Rptr. 37]; *Barenfeld* v. *City of Los Angeles, supra,* 162 Cal.App.3d at p. 1040; cf. *Voters for Responsible Retirement* v. *Board of Supervisors* (1994) 8 Cal.4th 765, 780 [35 Cal.Rptr.2d 814, 884 P.2d 645] [statutes must be upheld " ' "unless their unconstitutionality clearly, positively, and unmistakably appears" ' "]; *County of Sonoma* v. *State Energy Resources Conservation etc. Com.* (1985) 40 Cal.3d 361, 368 [220 Cal.Rptr. 114, 708 P.2d 693] [legislation must be upheld unless conflict with constitutional provision is "clear and unquestionable"].) Judges may not substitute their judgment for that of the Legislature if there is any reasonable justification for the latter's action. (*Lockard* v. *City of Los Angeles, supra,* 33 Cal.2d at p. 461; *Barenfeld* v. *City of Los Angeles, supra,* 162 Cal.App.3d at p. 1040.) This means that if reasonable minds may differ as to the reasonableness of a legislative enactment (*Consolidated Rock Products Co.* v. *City of Los Angeles* (1962) 57 Cal.2d 515, 522 [20 Cal.Rptr. 638, 370 P.2d 342], citing *Miller* v. *Board of Public Works* (1925) 195 Cal. 477, 490; *Matter of Application of Miller, supra,* 162 Cal. at p. 696), or if the reasonableness of the enactment is fairly debatable (*Lockard* v. *City of Los Angeles, supra,* 33 Cal.2d at p. 462), the enactment must be upheld.

In 1981, this court made quite plain that the foregoing presumptions and rules of deference apply when legislation is challenged as being in conflict with article VII of the California Constitution (article VII). (*Pacific Legal Foundation* v. *Brown* (1981) 29 Cal.3d 168, 180-181 [172 Cal.Rptr. 487, 624 P.2d 1215] [holding that the State Employer-Employee Relations Act did not conflict with article VII or the merit system mandate].) As we recognized back then, the party challenging the legislation bears a "heavy burden" in demonstrating that its provisions "inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." (29 Cal.3d at pp. 180-181; see also *California State Employees' Assn.* v. *State of California* (1988) 199 Cal.App.3d 840, 846 [245 Cal.Rptr. 232] (*CSEA*) [rejecting facial

---

[1] I agree with Justice Ardaiz's analysis that, for purposes of evaluating a constitutional challenge to legislation, a court may not take judicial notice of the truth of its earlier findings of fact. (Dis. opn. of Ardaiz, J., *post,* at pp. 590-591, and cases cited therein.)

challenge to constitutionality of legislation authorizing state to contract with private sector for personal services].)

Instead of adhering to the familiar rules above, the majority regard Chapter 433 with hostility and see it as a sinister attempt by the Legislature to undermine the constitutional civil service provision and to circumvent the trial court injunction. While acknowledging that "courts must give legislative findings great weight and should uphold them unless unreasonable or arbitrary" (maj. opn., *ante*, at p. 569), the majority nonetheless decide that the ordinary deference courts owe to legislative action "vanishes" when "constitutionally protected rights" are threatened and that courts are not foreclosed from exercising "independent judgment of the facts" bearing on an issue of constitutional law (*ibid.*). Collectively exercising their "independent judgment of the facts," the majority ultimately determine there is no "substantial" evidence to support the Legislature's enactment of Chapter 433. (Maj. opn., *ante*, at p. 569.)

In disregarding the Legislature's determinations, the majority rely on authorities evaluating First Amendment challenges to legislation.[2] (E.g., *Spiritual Psychic Science Church* v. *City of Azusa* (1985) 39 Cal.3d 501, 514 [217 Cal.Rptr. 225, 703 P.2d 1119] [finding unconstitutional an ordinance prohibiting fortune telling]; *Turner Broadcasting System, Inc.* v. *FCC* (1994) 512 U.S. 622, 666 [114 S.Ct. 2445, 2471, 129 L.Ed.2d 497] [overturning summary judgment in favor of government in case challenging "must-carry" provisions of Cable Television Consumer Protection and Competition Act of 1992].) Because such cases rest upon the fundamental ideal that "each person should decide for him [*sic*] or herself the ideas and beliefs deserving of expression, consideration, and adherence" (*Turner Broadcasting System, Inc.* v. *FCC, supra*, 512 U.S. at p. 641 [114 S.Ct. at p. 2458]), courts have determined that " '[t]he rational connection between the remedy provided and the evil to be curbed, *which in other contexts might support legislation against attack* . . . , will not suffice.' " (*Spiritual Psychic Science Church* v. *City of Azusa, supra*, 39 Cal.3d at p. 514, italics added, and cases cited therein.) But never before has that approach been invoked to invalidate legislation resembling Chapter 433. One would expect the majority to justify the extreme and unprecedented action undertaken in this case with sound

---

[2]The majority also rely on a quote taken out of context from *Amwest Surety Ins. Co.* v. *Wilson* (1995) 11 Cal.4th 1243 at page 1252 [48 Cal.Rptr.2d 12, 906 P.2d 1112]. (See dis. opn. of Ardaiz, J., *post*, at pp. 603-605.)

legal analysis. The majority, however, offer no justification or analysis. None whatsoever.[3]

In my opinion, the majority's independent-judgment-of-the-facts approach shows a stunning lack of respect not only for controlling case law, but especially for legislative prerogative and the separation of powers. Like Justice Ardaiz, I believe the majority opinion will have far-reaching and pernicious effects, prompting individual judges to invalidate legislation whenever they decide that the legislative determinations, though concerning matters that are fairly debatable, are not supported by what they perceive as substantial evidence.

I find particularly disturbing the majority's conclusion that the constitutional validity of legislative enactments and amendments depends upon whether the Legislature is able to empirically disprove contrary trial court findings of fact. Such a rule contradicts the commonly accepted view, expressed in a wide variety of contexts, that "a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." (*FCC* v. *Beach Communications, Inc.* (1993) 508 U.S. 307, 315 [113 S.Ct. 2096, 2102, 124 L.Ed.2d 211] [rejecting equal protection challenge to rationality of legislative classifications in Cable Communications Policy Act of 1984]; cf. *Gregg* v. *Georgia* (1976) 428 U.S. 153, 184-186 [96 S.Ct. 2909, 2930-2931, 49 L.Ed.2d 859] [deferring to Georgia Legislature's judgment that capital punishment is valuable as a deterrent of crime, even though statistical attempts to evaluate its worth have occasioned a great deal of debate and results have been inconclusive]; *Legislature* v. *Eu* (1991) 54 Cal.3d 492, 524 [286 Cal.Rptr. 283, 816 P.2d 1309] [rejecting federal constitutional challenge to term limits initiative and finding no need for initiative's defenders to empirically demonstrate that the initiative will accomplish each of its objectives]; *Buhl* v. *Hannigan* (1993) 16 Cal.App.4th 1612, 1619-1621 [20 Cal.Rptr.2d 740] [rejecting motorcyclists' due process challenge to helmet law and holding that state had no obligation to come forward with evidence controverting motorcyclists' evidence that helmet law did not accomplish intended safety purpose]; *Rittenband* v. *Cory* (1984) 159 Cal.App.3d 410, 424-430 [205 Cal.Rptr. 576] [rejecting equal protection challenge to Judges' Retirement Law, which used age as a proxy for judicial competence, and following federal precedent declaring that correlation between increasing age and decreasing ability to competently perform work is a logical assumption that

---

[3]Likewise, the majority fail to identify what "constitutionally protected rights" are at stake here which might cause the ordinary rules of deference to "vanish." (See maj. opn., *ante*, at p. 569, citing *Spiritual Psychic Science Church* v. *City of Azusa, supra*, 39 Cal.3d at p. 514.)

need not be verified by current empirical proof].) The majority offer no legal justification or policy rationale for abandoning this bedrock principle of law when legislative decisionmaking happens to follow litigation on related subject matter.[4]

As this very case illustrates, application of the majority's independent-judgment-of-the-facts approach permits legislative determinations and enactments to be "trumped" by court findings based upon scant evidence and never challenged on appeal. As I shall explain below, however, due deference to the legislative process, coupled with straightforward adherence to precedent interpreting the proper reach of the constitutional civil service provision, foreclose such a bizarre result.

## II.

It is settled that "constitutional and other enactments must receive a liberal, practical common-sense construction which will meet changed conditions and the growing needs of the people." (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281].) Consistent with this principle, *CSEA, supra,* 199 Cal.App.3d 840, recognized that allowing the state to consider cost savings in determining the propriety of private contracting serves the dual purposes of article VII " 'to promote efficiency and economy' " in state government and "to eliminate the 'spoils system' of political patronage." (*CSEA, supra,* 199 Cal.App.3d at pp. 846-847.) In this case, the principal issue is whether Chapter 433 constitutes a constitutionally valid attempt by the Legislature to encourage private contracting in furtherance of these objectives.

In 1993, the Legislature enacted Chapter 433 in recognition that California needed a "comprehensive and integrated highway construction plan" to maximize the capture and use of federal, state, local, and private funds and to maintain a competitive posture in seeking supplemental federal funds. (Gov. Code, § 14130, subd. (a)(2), operative until Jan. 1, 1998.) Consistent

---

[4]I also find troubling the majority's suggestion that legislative action may be validated based only upon data and studies actually considered by the legislative body. (Maj. opn., *ante,* at pp. 572, 573.) Even the First Amendment cases relied upon by the majority do not espouse such a view. (See *Sable Communications of Cal., Inc.* v. *FCC* (1989) 492 U.S. 115, 133 [109 S.Ct. 2829, 2840, 106 L.Ed.2d 93] (conc. opn. of Scalia, J.) ["Neither due process nor the First Amendment requires legislation to be supported by committee reports, floor debates, or even consideration, but only by a vote."].)

with previous legislative findings regarding the need for additional contracting flexibility to ensure timely and cost-effective project delivery,[5] the Legislature noted in its Chapter 433 findings that Caltrans's use of private consultants had recently accelerated nearly $1 billion worth of construction projects on the state highway system and that this increase in project delivery capability must continue for Caltrans to meet its commitments for timely project delivery. (Gov. Code, § 14130, subd. (a)(4), operative until Jan. 1, 1998.) With these findings in mind, the Legislature granted Caltrans additional flexibility until January 1, 1998, to contract with private engineers for projects involving the seismic retrofitting of highway structures in accordance with statutes enacted following the 1989 Loma Prieta Earthquake and for state transportation projects funded by local resources. (Gov. Code, §§ 14130, subd. (c), operative until Jan. 1, 1998, 14130.1, 14130.2.)

In finding that Chapter 433 conflicts with article VII, the majority point to an alleged absence of any empirical evidence that Caltrans is unable to perform the services in question "adequately and competently" through civil service, or that private contracting has resulted and will result in "substantial costs savings or other significant advantages" to the state. (Maj. opn., *ante*, at p. 572.) In the majority's view, the supposed lack of any such evidence before the Legislature is significant since here the trial court's findings to the contrary were supported by one study purporting to show that the cost of contracting was substantially greater than the cost of using civil service staff. (Maj. opn., *ante*, at p. 573.)

I disagree. As both United States Supreme Court precedent (*FCC* v. *Beach Communications, Inc., supra*, 508 U.S. at p. 315 [113 S.Ct. at p. 2102]; *Gregg* v. *Georgia, supra*, 428 U.S. at pp. 184-186 [96 S.Ct. at pp. 2930-2931]) and our own California case law (*Legislature* v. *Eu, supra*, 54 Cal.3d at p. 524; *Buhl* v. *Hannigan, supra*, 16 Cal.App.4th at pp. 1619-1621; *Rittenband* v. *Cory, supra*, 159 Cal.App.3d at pp. 424-430) clearly demonstrate, it is unnecessary for the Legislature to adduce concrete data or conclusive proof to confirm its determinations regarding the advantages of contracting with the private sector and the need for additional flexibility in that regard.

Indeed, even if empirical evidence were required to validate the Legislature's action, there is no doubt it existed in this case. The legislative history

---

[5]Years before the enactment of Chapter 433, the Legislature, finding that changes in federal, state, and local revenues and the growing private participation in state highway construction can result in significant fluctuations in project development workload, determined it was in the public interest for Caltrans to maintain a more stable work force and to avoid the costly process of short-time hiring and layoff while still responding in a timely manner to funding opportunities and uncertainties. (Stats. 1988, ch. 9, § 1, p. 30.)

confirms that when Chapter 433 was passed, the issue of cost-effectiveness of contracting for professional services was a hotly disputed matter. (Sen. Transportation Com., Rep. on Sen. Bill No. 1209 (1993-1994 Reg. Sess.) as amended June 24, 1993, pp. 1-2; Sen. Appropriations Com., Fiscal Summary of Sen. Bill. No. 1209 (1993-1994 Reg. Sess.) as amended June 24, 1993; Assem. Com. on Transportation, Rep. on Sen. Bill No. 1209 (1993-1994 Reg. Sess.) as amended July 14, 1993.) Although some studies, such as the one considered by the trial court below, estimated the average total cost of contracting out as being higher than using Caltrans staff (Sen. Appropriations Com., Fiscal Summary of Sen. Bill. No. 1209 (1993-1994 Reg. Sess.) as amended June 24, 1993), such estimates were open to question (Legis. Analyst, letter to Sen. Marian Bergeson (July 15, 1993) p. 2 [advising that estimates of average civil staff personnel costs and average private consultant personnel costs were not directly comparable because the estimates were not based solely on the number of staff hours spent directly on performing project development activities]) and were contradicted by other evaluations (Sen. Transportation Com., Rep. on Sen. Bill No. 1209 (1993-1994 Reg. Sess.) as amended June 24, 1993; Sen. Appropriations Com., Fiscal Summary of Sen. Bill. No. 1209 (1993-1994 Reg. Sess.) as amended June 24, 1993; Assem. Com. on Transportation, Rep. on Sen. Bill No. 1209 (1993-1994 Reg. Sess.) as amended July 14, 1993). Moreover, the Legislature heard from those knowledgeable on the issue of contracting[6] that contracting would provide more flexibility in addressing relatively short-term workload increases and expedite the delivery of transportation projects, and that waiting for Caltrans to hire and train new employees would delay locally funded projects and potentially increase the cost to local taxpayers. (See *ibid.*) Because reasonable minds obviously could differ and did differ over the economies of contracting, it is only fair to conclude that reasonable minds may differ as to the reasonableness of Chapter 433 and its plan for ensuring timely and cost-effective project delivery. Under these circumstances, the legislative judgment may not be set aside. (*Matter of Application of Miller, supra,* 162 Cal. at p. 696; *Miller v. Board of Public Works, supra,* 195 Cal. at p. 490.)

In any event, there is an additional reason why the contracting authorized by Chapter 433 is constitutionally permissible despite the perceived absence of concrete data proving the cost-effectiveness of contracting or the inadequacy of civil service staff. As the majority recognize (maj. opn., *ante,* at pp. 550, 568), the constitutional civil service provision has been construed to allow the state to contract privately for services that state employees have

---

[6]Supporters of Chapter 433 included various local transportation agencies, the California Transportation Commission, and private engineering firms.

traditionally performed where such services are withdrawn from state service or privatized on an experimental basis. (*Professional Engineers* v. *Department of Transportation* (1993) 13 Cal.App.4th 585 [16 Cal.Rptr.2d 599] (*Professional Engineers*).) As I shall explain, Chapter 433 provides a constitutionally valid basis for dissolving the 1990 injunction on the same ground.

In *Professional Engineers, supra,* 13 Cal.App.4th 585, the Legislature had enacted an urgency measure authorizing Caltrans to contract with private developers to construct and operate tollways under lease agreements with the state. As there described by the Court of Appeal, "[t]his legislation arose from a legislative determination that '[p]ublic sources of revenues to provide an efficient transportation system have not kept pace with California's growing transportation needs, and alternative funding sources should be developed to augment or supplement available public sources of revenue.' (Stats. 1989, ch. 107, § 1, subd. (b), p. 1018.) The Legislature envisioned that privately financed projects could '[t]ake advantage of private sector efficiencies' and '[m]ore quickly bring reductions in congestion in existing transportation corridors.' (Stats. 1989, ch. 107, § 1, subd. (e), p. 1018.) Finally, through authorized demonstration projects, Caltrans could test the feasibility and efficiency of the private financing and construction model. (Stats. 1989, ch. 107, § 1, subd. (f), p. 1018.)" (*Professional Engineers, supra,* 13 Cal.App.4th at p. 589.)

In that case, the Court of Appeal upheld the challenged legislation, concluding that although the design and construction of roads were neither new functions nor ones that state workers could not satisfactorily perform, the privatization program was an experimental one, and no state funds would be used to defray construction costs. (*Professional Engineers, supra,* 13 Cal.App.4th at p. 593.) Finding that California Constitution, article VII did not discourage such experimentation, the Court of Appeal reasoned: "[T]o strike down these efforts would denigrate a key purpose of the civil service mandate—to promote efficiency and economy in state government. *Of course these efficiencies and economies remain to be proven, but the very purpose of the demonstration projects is to explore the feasibility of the private financing/management approach.*" (13 Cal.App.4th at pp. 593-594, italics added.)

This case presents a similar example of permissible legislative experimentation. In addition to authorizing increased contracting flexibility until January 1, 1998, Chapter 433 contains an uncodified section which requires Caltrans and the Legislative Analyst to coordinate in the preparation of a

report to evaluate the economic viability of contracting out to the private sector. (Ch. 433, § 13.) By September 1, 1996, Caltrans was to submit data to the Legislative Analyst on total project costs for two groups of comparable highway projects. (Ch. 433, § 13, subd. (a).) As envisioned by the Legislature, one group of projects was to consist of projects for which engineering services were provided primarily by civil service staff and the second group was to consist of similar projects for which engineering services were provided primarily by outside consultants. (*Ibid.*) In turn, the Legislative Analyst was required to forward to the Legislature, as part of its ascertainment of facts and recommendations with respect to the Budget Act of 1997, a report on the cost-effectiveness of Caltrans's use of contracted services rather than state employees.[7] (Ch. 433, § 13, subd. (b); Legis. Counsel's Dig., Sen. Bill No. 1209, Stats. 1993, ch. 433 (Reg. Sess.) par. (5).)

Presuming the Legislature acted with integrity and with the desire that Chapter 433 be valid and fall within constitutional bounds (*Beach* v. *Von Detten, supra,* 139 Cal. at pp. 464-465), I conclude the statutory scheme and its call for a cost-effectiveness study are rationally related to the goal of achieving the most economical mix of public and private service for the timely delivery of state transportation projects. Thus, even though the experimental nature of Chapter 433 may result in individual contract awards which are later demonstrated to lack cost-effectiveness, the Legislature reasonably could have concluded that the act's provisions will—on an overall basis, or in the long term, or both—further the objectives of efficiency and economy in project delivery.

Moreover, the contracting authorized by Chapter 433 will not encourage a return to the spoils system of political patronage. (*CSEA, supra,* 199 Cal.App.3d at p. 847.) Notably, all such contracts are subject to statutes and regulations protecting against cronyism. (Gov. Code, former § 14132.1 [contracts of $250,000 or less]; Gov. Code, § 14133 [contracts over $250,000 must comply with Gov. Code, § 4525 et seq.]; Gov. Code, § 4525 et seq. [selection of engineers must be based on demonstrated competence, professional qualifications, and price]; Cal. Code Regs., tit. 16, § 474 et seq. [establishing criteria for selection of contractors, selection process, and rules against conflicts of interest and unlawful activity].) Although these statutes and regulations do not require competitive bidding for the type of services at issue, it has long been recognized that " 'the employment of a person who is

---

[7]I recognize that the protracted litigation over Chapter 433 has by now probably defeated the Legislature's intent in this regard. Nonetheless, such intent must be considered in assessing the constitutional validity of the enactment.

highly and technically skilled in his science or profession is one which may properly be made without competitive bidding.' " (*Cobb* v. *Pasadena City Bd. of Education* (1955) 134 Cal.App.2d 93, 95 [285 P.2d 41] [competitive proposals do not produce an advantage in hiring professionals such as architects].)

The majority find Chapter 433's provisions "too far-reaching in scope" to qualify as permissible legislative experimentation under *Professional Engineers, supra*, 13 Cal.App.4th 585. (Maj. opn., *ante*, at p. 568.) That is, the majority apparently view Chapter 433 as applying to engineering services for project development on a broad, unlimited basis. In addition, the majority read *Professional Engineers* as confining the scope of permissible experimentation to projects involving the *total* withdrawal of a state function. (Maj. opn., *ante*, at p. 568.) Those objections are off the mark.

First of all, Chapter 433's provisions are explicitly limited both in their application and in their duration. In amending the Government Code in 1993, Chapter 433 sought to extend additional flexibility in contracting only to engineering services pertaining to projects involving statutorily required seismic safety retrofitting of publicly owned bridges (Gov. Code, § 14130.1; Sts. & Hy. Code, § 179 et seq.) and to locally funded highway projects[8] (Gov. Code, § 14130.2). (Sen. Appropriations Com., Fiscal Summary of Sen. Bill. No. 1209 (1993-1994 Reg. Sess.) as amended June 24, 1993.) And as indicated previously, it is contemplated that these statutory provisions are to remain in effect only until January 1, 1998.[9] (Gov. Code, §§ 14130, subd. (f), operative until Jan. 1, 1998, 14130.1, subd. (c), 14130.2, subd. (c).)

Second, contrary to the majority's suggestion, the experimentation at issue in *Professional Engineers* did not require the "total" withdrawal of a state function. That is, the challenged legislation did not compel Caltrans to

---

[8]It is specifically in the context of locally funded highway projects that the Legislature excused Caltrans from the requirement of having to staff at a level to provide services for other agencies. (Gov. Code, § 14130.2, subd. (a)(2).)

[9]Consistent with the view that Chapter 433 is provisional in nature, the Legislature declared that engineering services necessary for seismic safety retrofitting "shall be considered a short-term workload demand." (Gov. Code, § 14130.1, subd. (b).) On this point, the Legislature obviously had in mind the fact that the retrofitting, which had been mandated by statute following the Loma Prieta Earthquake in 1989, required completion by December 31, 1994, at the latest. (Sts. & Hy. Code, § 179.4 [requiring all deficient bridges and structures to be retrofitted or replaced by December 31, 1992, December 31, 1993, or December 31, 1994, depending upon circumstances]; see Gov. Code, § 14130.1, subd. (a) [noting that certain of the contracts for retrofit projects were required to be executed by December 31, 1993].) Unlike the majority, I believe these circumstances amply support the Legislature's decision to categorize the engineering services required for such projects as a short-term workload demand.

withdraw entirely from the function of constructing or operating tollways; Caltrans maintained responsibility for such functions on other projects not covered by the legislation. Moreover, although the experimentation in that case called for private entities to construct and operate the particular projects at issue, it nonetheless contemplated that Caltrans would maintain a supervisory role and " 'exercise any power possessed by it with respect to the development and construction of state transportation projects.' " (*Professional Engineers, supra*, 13 Cal.App.4th at p. 590, quoting Sts. & Hy. Code, § 143, subd. (c); see Sts. & Hy. Code, § 143, subd. (e) [plans and specifications for projects to comply with Caltrans's standards for state transportation projects].) In substance, such experimentation is not materially different from that which is authorized by Chapter 433.[10]

Finally, the majority claim that nothing in its decision "would prevent Caltrans from seeking modification of the 1990 injunction based on a showing that particular contracts are justified because state workers cannot perform the work 'adequately and competently,' or as economically . . . ." (Maj. opn., *ante*, at p. 574.) Yet it is paradoxical for the majority to acknowledge that the results of the cost-comparison study mandated by Chapter 433 (which the majority concede was intended to help determine the economies of private contracting) "could well assist" Caltrans in making such a showing, while at the same time holding that Caltrans is not entitled to relief before such a study is performed. (Maj. opn., *ante*, at p. 574.) In my view, Caltrans should not have to prove the economies of any particular contract in advance of the mandated study if the whole purpose of the study is to ascertain just such information.

In sum, article VII would not be undermined by the operation of Chapter 433. The majority have not shown that the Legislature was clearly or palpably wrong in determining that Chapter 433's provisions for additional flexibility in contracting will promote efficiency and economy in state government. Moreover, as *Professional Engineers, supra*, 13 Cal.App.4th 585, illustrates, changing conditions and California's growing transportation needs justify a "liberal, practical common-sense construction" (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra*, 22 Cal.3d at p. 245) of article VII that encourages innovation and experimentation, even where the cost-effectiveness of particular contracts has not been proven in advance.

---

[10]Although the legislation at issue in *Professional Engineers* differs from Chapter 433 insofar as it involved no expenditure of state funds, the majority recognize that article VII would permit experimentation "despite the use of state funding." (Maj. opn., *ante*, at p. 568.)

### III.

The majority's decision to apply an independent-judgment-of-the-facts approach in assessing the constitutional validity of legislative action marks a radical departure from long-standing case law holding that judges may not substitute their judgment for that of the Legislature if there is any reasonable justification for the legislative action. I see no legitimate basis for such an approach, which intrudes upon the legislative process in outright disregard of the separation of powers.

Given the pressing demands upon California to meet its growing transportation needs and the funding and safety concerns that support timely project delivery, it behooves this court to uphold legislative experimentation to the maximum extent consistent with article VII of our state Constitution. Because Chapter 433 encourages contracting flexibility on an expressly limited basis and for the very purpose of promoting and ascertaining efficiency and economy, and because it subjects such contracting to rules protecting against political favoritism, I believe it provides a valid basis, consistent with the constitutional civil service provision, for dissolving the 1990 trial court injunction.

I would affirm the judgment of the Court of Appeal.

**ARDAIZ, J.**\*—I respectfully dissent.

In Statutes 1993, Chapter 433 (Chapter 433), the California Legislature made factual findings expressly concluding that under certain circumstances, "the use of private consultants to supplement [Caltrans's] workforce has permitted the department to substantially enhance its project delivery." (Gov. Code, § 14130, subd. (a)(4), as contained in Ch. 433.)[1] In other words, the Legislature concluded it is more efficient and less expensive *not* to expand state government when certain types of road and bridge engineering services can be performed by private consultants. This case is about whether the state must hire new employees to perform such work or may contract out those services under statutory provisions. Plaintiffs argue that the state must hire additional employees and that the Legislature's efforts are unconstitutional. The Department of Transportation (Caltrans) argues that the Legislature has complied with the Constitution and that the Legislature's factual findings supporting Chapter 433 justify private contracting.

---

\*Presiding Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]References to undesignated code sections are to provisions of the Government Code as contained in Chapter 433.

As a matter of procedural history, the trial court was asked by Caltrans to consider Chapter 433 as changing the basis for its original injunction. The trial court made a determination that the Legislature's factual findings were unsupported and erroneous based on factual conclusions reached by the trial court in its 1990 judgment and various orders of enforcement. Based on that premise, the trial court found Chapter 433 unconstitutional and concluded, therefore, that Chapter 433 could not then be considered a change in circumstances justifying modification of the 1990 injunction.

I conclude that the trial court erred in rejecting the factual findings of the Legislature, and that neither the trial court nor this court may reject such findings except under very limited circumstances not present here. I further conclude that Chapter 433 does not violate article VII of the California Constitution (article VII) and is constitutional on its face. Since the trial court erred in its determination that Chapter 433 was unconstitutional, the entire basis upon which it refused to modify or dissolve the injunction must be reversed. I believe the majority's reasoning is contrary to well-established precedent, impairs the ability of the legislative branch of government to perform its constitutional functions, and creates a review process that may well violate the fundamental principle of separation of powers.

I. *The Majority Err by Approving the Trial Court's Reliance on the Truth of its Own 1990 Findings to Reject the Legislature's Subsequent Factual Findings.*

The trial court clearly engaged in its own independent factual analysis to conclude that the findings expressed by the Legislature in support of Chapter 433 were unsubstantiated and wrong; hence, the legislation is unconstitutional. Such a determination is endorsed by the majority opinion; however, I conclude that application or consideration of the trial court's findings is inappropriate under long-standing and well-regarded case law which the majority opinion fails to acknowledge and has not distinguished by applicable precedent. At oral argument, plaintiffs conceded that the appropriate standard of review for legislative findings was expressed in *Lockard* v. *City of Los Angeles* (1949) 33 Cal.2d 453, 461 [202 P.2d 38, 7 A.L.R.2d 990], wherein this court stated: " '[T]he rule is well settled that the legislative determination that the facts exist which make the law necessary, must not be set aside or disregarded by the courts, unless the legislative decision is *clearly and palpably wrong and the error appears beyond reasonable doubt from facts or evidence which cannot be controverted, and of which the courts may properly take notice.*' [Citations.]" (Italics added.)

This statement is an evolution of *Stevenson* v. *Colgan* (1891) 91 Cal. 649, 652-653 [27 P. 1089]: "While the courts have undoubted power to declare a

statute invalid, when it appears to them in the course of judicial action to be in conflict with the constitution, yet they can only do so when the question arises as a pure question of law, unmixed with matters of fact the existence of which must be determined upon a trial, and as the result of it, it may be, conflicting evidence. When the right to enact a law depends upon the existence of facts, it is the duty of the legislature, before passing the bill, and of the governor before approving it, to become satisfied in some appropriate way that the facts exist, and no authority is conferred upon the courts to hear evidence, and determine, as a question of fact, whether these co-ordinate departments of the state government have properly discharged such duty. *The authority and duty to ascertain the facts which ought to control legislative action are, from the necessity of the case, devolved by the constitution upon those to whom it has given the power to legislate, and their decision that the facts exist is conclusive upon the courts, in the absence of an explicit provision in the constitution giving the judiciary the right to review such action. We therefore hold, that in passing upon the constitutionality of a statute, the court must confine itself to a consideration of those matters which appear upon the face of the law, and those facts of which it can take judicial notice. If the law, when thus considered, does not appear to be unconstitutional, the court will not go behind it, and, by a resort to evidence, undertake to ascertain whether the legislature, in its enactment, observed the restrictions which the constitution imposed upon it as a duty to do, and to the performance of which the members were bound by their oaths of office.*" (Italics added.)

The trial court in the instant case was aware of the restrictions placed upon its power to make factual determinations regarding statutes. In this regard, the trial court utilized the correct standard, stating: "The courts may set aside the legislative findings on which the constitutionality of a statute is based only if the legislative findings could not reasonably be true on their face or in light of judicially noticeable facts." The trial court then took "judicial notice pursuant to Evidence Code § 452, subdivision (d), of the findings in the statement of decision underlying the judgment entered April 17, 1990, and the findings in the orders issued after evidentiary hearings to enforce the judgment."[2] In my view, the court erred in its determination of what constituted judicially noticeable facts.

---

[2] Evidence Code section 452, subdivision (d) permits judicial notice to be taken of records of "any court of this state."

The trial court also concluded that many of the facts in those findings (of April 17, 1990, and subsequent enforcement orders) were judicially noticeable pursuant to Evidence Code section 452, subdivisions (g) and (h). Those provisions, respectively, permit judicial notice to be taken of "[f]acts and propositions that are of such common knowledge within the territorial jurisdiction of the court that they cannot reasonably be the subject of dispute" and "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and

We must first look to what was decided. The trial court concluded the 1990 injunction should remain in place because Chapter 433 was unconstitutional and therefore could not and did not impact the injunction. The basis for the trial court's decision was *not* that the legislative findings in Chapter 433 may have conflicted with its earlier injunction and findings of fact, thereby creating a possible separation of powers issue.[3] Rather, the trial court concluded the Legislature's findings of fact in Chapter 433 were palpably erroneous and inconsistent with article VII because the court took judicial notice of the truth of its previous factual findings.[4]

---

accurate determination by resort to sources of reasonably indisputable accuracy." While it theoretically would be possible for the trial court to take judicial notice pursuant to Evidence Code section 452, subdivisions (g) and (h), I have examined the trial court's statement of decision and can find no facts of consequence that would fall within either of these provisions.

[3]Although the trial court stated that section 14137 raises a "serious question" about a violation of the separation of powers doctrine, it is clear that the trial court's decision did not rest on this point.

In my view, Chapter 433 is not unconstitutional on its face on the ground that in sections 14130.3 and 14137, the Legislature impinged upon the separation of powers by authorizing contracts which may be inconsistent with a specific trial court judgment. Since the trial court did not base its decision on this ground, however, and given that the contracts at issue no longer appear to be in effect in any event, I see no need to discuss the issue.

[4]The trial court's use solely of factual conclusions to undermine legislative findings is best illustrated by its order of April 19, 1994, wherein the court stated: "In section 14130, subdivision (a)(5), the Legislature finds that 'the use of private consultants to assist in project delivery is a new state function and does not duplicate the existing functions of the department.' . . . [¶] From facts *which the Court may properly judicially notice*, it is evident that defendants' contracts with private consultants for the performance of engineering services to deliver highway projects duplicate an existing state function historically performed by civil service staff. The contracts are intended to supplement the work of civil service staff (see § 14130, subd. (a)(4)), and defendants use private consultants interchangeably with civil service staff to provide project design and development, construction inspection, locally funded, seismic retrofitting, and other project delivery services. . . . [N]o new methods of managing, financing, or otherwise performing project delivery work distinguish the work performed by private consultants from that historically and presently performed by civil service staff. [¶] Subdivision (5)(a) [*sic*] is palpably wrong in finding that defendants' use of private consultants to perform project delivery services is a new state function, years after civil service staff began performing the function. (See *Department of Transportation* v. *Chavez* (1992) 7 Cal.App.4th 407, 415-416 [9 Cal.Rptr.2d 176].)" (Fn. omitted, italics added.)

Likewise, regarding section 14130, subdivision (a)(4), the court concluded: "In section 14130, subdivision (a)(4), the Legislature finds that '[w]ithout the ability to continue a stable contracting out program, . . . the department will not be able to perform project delivery adequately, competently, or satisfactorily.' In support of this finding, subdivision (a)(4) indicates that the use of private consultants has substantially enhanced project delivery; that private consultants recently helped to accelerate nearly one billion dollars worth of state highway projects; and that this increase in project delivery capability must continue for timely project delivery. [¶] . . . [¶] The legislative finding in subdivision (a)(4) categorically establishes the inadequacy of defendants' civil service staff to timely deliver the workload. Without consideration of defendants' actual workloads in particular fiscal years or the actual

It was by judicially noticing the truth of these factual findings that the court fundamentally erred. In effect, the trial court circumvented *Lockard* and *Stevenson* by taking judicial notice of the truth of its own findings. It was precisely these findings of fact which the trial court utilized to undermine the legislative findings and to conclude that Chapter 433 was unconstitutional: "In Chapter 433 of the Statutes of 1993, the Legislature has sought to provide defendants with justifications under article VII to implement their administrative and management policies for contracting. The legislative findings and directives comprising the justifications, however, are obviously erroneous, unreasonable and inconsistent with the constitutional civil service mandate."

Under the rule of *Lockard* and *Stevenson*, the trial court's prior factual findings *when made* could not properly be the basis upon which to find erroneous the legislative conclusions set forth to support Chapter 433. They cannot, therefore, become the basis through the mechanism of judicial notice. In other words, the trial court cannot do indirectly what it is not permitted to do directly. Further, judicial notice of findings of fact does not mean that those findings of fact are true, but, rather, only means that those findings of fact were made. (*Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1564-1565 [8 Cal.Rptr.2d 552]; accord, *Fowler v. Howell* (1996) 42 Cal.App.4th 1746, 1749 [50 Cal.Rptr.2d 484]; *Ludwig v. Superior Court* (1995) 37 Cal.App.4th 8, 14, fn. 6 [43 Cal.Rptr.2d 350] [ability to judicially notice truth of statements "seriously doubted"]; *Western Mutual Ins. Co. v. Yamamoto* (1994) 29 Cal.App.4th 1474, 1485 [35 Cal.Rptr.2d 698].)

"[N]either a finding of fact made after a contested adversary hearing nor a finding of fact made after any other type of hearing can be indisputably deemed to have been a correct finding . . . [;] '[u]nder the doctrine of judicial notice, certain matters are assumed to be indisputably true, and the introduction of evidence to prove them will not be required.' (1 Witkin, Cal.

---

number of regular and temporary civil service staff who could be obtained to accomplish the workloads in those years, the Legislature determines that defendants' workload will inevitably exceed the capability of civil service staff and, therefore, a 'stable contracting out program' to supplement civil service staff will inevitably be necessary to timely respond to funding opportunities and timely deliver projects. [¶] Such is not the case. *As the Court may judicially notice*, the inadequacy of civil service staff to timely deliver the workload of highway projects has been traceable, not to a lack of available or obtainable personnel qualified to perform the work, but to defendants' policy and practice since the 1980s of maintaining civil service staff at a level inadequate to perform the workload and in contracting privately for the portion of the workload exceeding the staff's capacity. . . . [¶] . . . [¶] The legislative finding in subdivision (a)(4), conclusively establishing the inadequacy of civil service to perform the project delivery workload, is clearly wrong and cannot constitutionally justify defendants' contracts for project development services." (Fns. omitted, italics added.)

The trial court used similar factual conclusions elsewhere in its order as well.

Evidence (3d ed. 1986) [Judicial Notice,] § 80[, p. 74].) Taking judicial notice of the truth of a judge's factual finding [is] tantamount to taking judicial notice that the judge's factual finding must necessarily have been correct and that the judge is therefore infallible." (*Sosinsky* v. *Grant, supra,* 6 Cal.App.4th at p. 1568.)

The majority note that the trial court's 1990 injunction has become final, and that Caltrans has never challenged the trial court's earlier findings and conclusions. While this is true, it is irrelevant in determining whether the trial court properly took judicial notice of those earlier findings and conclusions. "Under the doctrine of judicial notice, certain matters are assumed to be *indisputably true,* and the introduction of evidence to prove them will not be required." (1 Witkin, Cal. Evidence (3d ed. 1986) Judicial Notice, § 80, p. 74, italics added.) " '[F]acts' which were *in actuality* the subject of a reasonable dispute [do not] become, after the dispute has been judicially decided, 'facts' which could not reasonably be subject to dispute merely because the doctrines of res judicata and collateral estoppel, if properly shown to apply, might operate to prevent further litigation of the dispute." (*Sosinsky* v. *Grant, supra,* 6 Cal.App.4th at p. 1566.) "Whether a factual finding is true is a different question than whether the truth of that factual finding may or may not be subsequently litigated a second time. The doctrines of res judicata and collateral estoppel will, when they apply, serve to bar relitigation of a factual dispute even in those instances where the factual dispute was erroneously decided. . . . [Citations.]" (*Id.* at p. 1569.)

Plaintiffs also assert there was no objection to the trial court taking judicial notice. However, the constitutionality of a statute cannot turn on "the vagaries of litigation tactics." (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 14 [112 Cal.Rptr. 786, 520 P.2d 10].) To hold otherwise would invite chaos. The constitutionality of Chapter 433 is a question of law; hence, "we are not bound by evidence presented on the question in the trial court. [Citations.] The propriety of the use of extrinsic materials in determining legislative intent is a question which may properly be considered on appeal regardless of whether the issue was raised in the trial court." (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856].) Accordingly, the propriety of the trial court's action in taking judicial notice may be considered on appeal despite the lack of objection in the trial court.

Thus, contrary to the majority, I conclude that the trial court's prior findings of fact should not and cannot properly be utilized to invalidate the legislation in Chapter 433 as unconstitutional. The trial court's earlier

findings of fact cannot be used to controvert the Legislature's later findings. This court must disregard the earlier findings in determining whether Chapter 433 is unconstitutional.

## II. *The Majority Err by Not Applying the Presumption of Constitutionality.*

The majority have, in my view, reversed the standard by which the Legislature's findings and determinations are reviewed. It would appear the majority sought to find the legislation unconstitutional, whereas long-standing precedent requires just the opposite—that the court attempt to uphold the enactment.

The trial court found Chapter 433 unconstitutional on its face as opposed to unconstitutional as applied. "[A]n as applied challenge assumes that the statute . . . violated is valid and asserts that the manner of enforcement against a particular individual or individuals or the circumstances in which the statute . . . is applied is unconstitutional." (*Tobe* v. *City of Santa Ana* (1995) 9 Cal.4th 1069, 1089 [40 Cal.Rptr.2d 402, 892 P.2d 1145].) Here, the trial court did not assume that Chapter 433 was valid, but instead found it to be unconstitutional because it authorized Caltrans to contract out in a manner which violated article VII.[5]

In determining whether legislation is facially invalid, it is settled that "[a] facial challenge to the constitutional validity of a statute . . . considers only the text of the measure itself, not its application to . . . particular circumstances. . . ." (*Tobe* v. *City of Santa Ana, supra,* 9 Cal.4th at p. 1084.) In order to prevail in a facial attack on a legislative enactment, the challenge must establish that under no circumstance can the legislation be applied without violating the Constitution. "[P]etitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute. . . . Rather, petitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." (*Pacific Legal Foundation* v. *Brown* (1981) 29 Cal.3d 168, 180-181 [172 Cal.Rptr. 487, 624 P.2d 1215], original italics; *Tobe, supra,* at p. 1084; see also *Superior Court* v. *County of Mendocino* (1996) 13 Cal.4th 45, 60-61 [51

---

[5]The trial court stated: "The Court concludes that Chapter 433 of the Statutes of 1993 is unconstitutional in that it authorizes defendants to contract with private consultants for the performance of project development services without a factual showing that the contracts are permissible under article VII. The enactment of Chapter 433 accordingly, does not warrant the modification or dissolution of the injunction in this action." At oral argument, plaintiffs conceded the trial court found Chapter 433 unconstitutional on its face.

Cal.Rptr.2d 837, 913 P.2d 1046].) In this regard, the burden here is not on Caltrans to validate Chapter 433, but on plaintiffs to *in*validate that legislation. (See *Pacific Legal Foundation* v. *Brown, supra,* 29 Cal.3d at pp. 180-181 ["petitioners must demonstrate" facial invalidity of challenged law].) This places a heavy burden on plaintiffs. (*Id.* at p. 180.)

In reviewing the constitutionality of legislation, it must be remembered that "[c]ourts have nothing to do with the wisdom of laws . . . , and the legislative power must be upheld unless manifestly abused so as to infringe on constitutional guaranties. . . . The only function of the courts is to determine whether the exercise of legislative power has exceeded constitutional limitations." (*Lockard* v. *City of Los Angeles, supra,* 33 Cal.2d at pp. 461-462; see also *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 219 [149 Cal.Rptr. 239, 583 P.2d 1281].) "Courts do not sit as super-legislatures to determine the wisdom, desirability or propriety of statutes enacted by the Legislature. [Citations.]" (*Estate of Horman* (1971) 5 Cal.3d 62, 77 [95 Cal.Rptr. 433, 485 P.2d 785].) "Under the system of government created by our Constitution, it is up to legislatures, not courts, to decide on the wisdom and utility of legislation." (*Ferguson* v. *Skrupa* (1963) 372 U.S. 726, 729 [83 S.Ct. 1028, 1030, 10 L.Ed.2d 93, 95 A.L.R.2d 1347].)

There is a "strong presumption of the constitutionality of an act of the Legislature." (*Delaney* v. *Lowery* (1944) 25 Cal.2d 561, 569 [154 P.2d 674].) Thus, " '[L]egislative findings, while not binding on the courts, are given great weight and will be upheld unless they are found to be unreasonable and arbitrary. [Citations.]' " (*Amwest Surety Ins. Co.* v. *Wilson* (1995) 11 Cal.4th 1243, 1252 [48 Cal.Rptr.2d 12, 906 P.2d 1112] (*Amwest*), quoting *California Housing Finance Agency* v. *Elliott* (1976) 17 Cal.3d 575, 583 [131 Cal.Rptr. 361, 551 P.2d 1193] (*Elliott*); accord, *The Housing Authority* v. *Dockweiler* (1939) 14 Cal.2d 437, 449-450 [94 P.2d 794].) " 'In considering the constitutionality of a legislative act we presume its validity, resolving all doubts in favor of the Act. Unless conflict with a provision of the state or federal Constitution is clear and unquestionable, we must uphold the Act. [Citations.]' " (*Amwest, supra,* at p. 1252, quoting *Elliott, supra,* at p. 594.) As this court stated 60 years ago, "judicial decisions abound with declarations to the effect that all presumptions and intendments favor the validity of statutes; that mere doubt by the judicial branch of the government as to the validity of a statute will not afford a sufficient reason for a judicial declaration of its invalidity, but that statutes must be upheld as constitutional unless their invalidity *clearly, positively, and unmistakably appears.*" (*People* v. *Superior Court* (1937) 10 Cal.2d 288, 298 [73 P.2d 1221], italics added.)

This court has adhered to these principles in numerous cases involving diverse situations.[6]

As this court stated in *Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 691 [97 Cal.Rptr. 1, 488 P.2d 161], "We are guided in our inquiry by well settled rules of constitutional construction. Unlike the federal Constitution, which is a grant of power to Congress, the California Constitution is a limitation or restriction on the powers of the Legislature. [Citations.] Two important consequences flow from this fact. First, the entire law-making authority of the state, except the people's right of initiative and referendum, is vested in the Legislature, and that body may exercise any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution. [Citations.] In other words, 'we do not look to the Constitution to determine whether the legislature is authorized to do an act, but only to see if it is prohibited.' [Citation.]

"Secondly, all intendments favor the exercise of the Legislature's plenary authority: 'If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used.' [Citations.]" (Accord, *California Housing Finance Agency* v. *Patitucci* (1978) 22 Cal.3d 171, 175 [148 Cal.Rptr. 875, 583 P.2d 729]; *Los Angeles Met. Transit Authority* v. *Public Util. Com.* (1963) 59 Cal.2d 863, 868 [31 Cal.Rptr. 463, 382 P.2d 583]; *Delaney* v. *Lowery, supra,*

---

[6]See, e.g., *In re M.S.* (1995) 10 Cal.4th 698, 710 [42 Cal.Rptr.2d 355, 896 P.2d 1365] (overbreadth and vagueness attacks on hate crimes statute); *Voters for Responsible Retirement* v. *Board of Supervisors* (1994) 8 Cal.4th 765, 780 [35 Cal.Rptr.2d 814, 884 P.2d 645] (referendum of county employee compensation); *People* v. *Hansel* (1992) 1 Cal.4th 1211, 1219 [4 Cal.Rptr.2d 888, 824 P.2d 694] (due process challenge to Penal Code section 1538.5, subdivision (i)); *McHugh* v. *Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348, 388-389 [261 Cal.Rptr. 318, 777 P.2d 91] (claim that statute permitted administrative agency to exercise judicial powers); *Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 814-815 [258 Cal.Rptr. 161, 771 P.2d 1247] (attack on facial validity of initiative measure); *Mills* v. *Superior Court* (1986) 42 Cal.3d 951, 957 [232 Cal.Rptr. 141, 728 P.2d 211] (statute permitting admission of written statements in lieu of non-eyewitness testimony at preliminary hearings); *People* v. *Superior Court (Engert)* (1982) 31 Cal.3d 797, 812 [183 Cal.Rptr. 800, 647 P.2d 76] (vagueness challenge to special circumstance statute); *In re Ricky H.* (1970) 2 Cal.3d 513, 519 [86 Cal.Rptr. 76, 468 P.2d 204] (requirement that minor's parents reimburse costs of appointed counsel in juvenile delinquency proceedings); *In re Dennis M.* (1969) 70 Cal.2d 444, 453 [75 Cal.Rptr. 1, 450 P.2d 296] (standard of proof in juvenile delinquency proceedings); *State of California* v. *Ind. Acc. Com.* (1957) 48 Cal.2d 365, 371 [310 P.2d 7] (apportionment of workers' compensation award); *Lockheed Aircraft Corp.* v. *Superior Court* (1946) 28 Cal.2d 481, 484 [171 P.2d 21, 166 A.L.R. 701] (statute prohibiting employer from regulating political activities of employees); *Elliott, supra,* 17 Cal.3d at p. 594 (local election requirement for low-rent housing projects).

25 Cal.2d at pp. 568-569; *Collins* v. *Riley* (1944) 24 Cal.2d 912, 916 [152 P.2d 169]; *Martin* v. *Riley* (1942) 20 Cal.2d 28, 39 [123 P.2d 488].)

Notably, in *Pacific Legal Foundation* v. *Brown, supra,* 29 Cal.3d 168, 180, this court applied the foregoing "fundamental principles of constitutional adjudication" to a challenge to legislation based on article VII. The majority fail to acknowledge this precedent.

Article VII, section 1 states: "(a) The civil service includes every officer and employee of the state except as otherwise provided in this Constitution. [¶] (b) In the civil service permanent appointment and promotion shall be made under a general system based on merit ascertained by competitive examination."

The purpose of this article, as disclosed in the ballot argument of its predecessor, California Constitution, former article XXIV, " 'is to promote efficiency and economy in state government. The sole aim of the act is to prohibit appointments and promotion in the service except on the basis of merit, efficiency, and fitness ascertained by competitive examination. . . .' " (*State Compensation Ins. Fund* v. *Riley* (1937) 9 Cal.2d 126, 134 [69 P.2d 985, 111 A.L.R. 1503] (*Riley*).) Article VII has been judicially interpreted as a restriction on contracting out state work to the private sector. (*California State Employees' Assn.* v. *State of California* (1988) 199 Cal.App.3d 840, 844 [245 Cal.Rptr. 232] (*CSEA*).) The restriction on contracting out does not arise from the express language of the Constitution, but rather "from an implicit necessity for protecting the policy of the organic civil service mandate against dissolution and destruction. [Citation.]" (*California State Employees' Assn.* v. *Williams* (1970) 7 Cal.App.3d 390, 397 [86 Cal.Rptr. 305] (*Williams*).)

In *Riley*, this court stated that the true test of whether contracting outside civil service is permissible, is "whether the services contracted for, whether temporary or permanent, are of such a nature that they could be performed by one selected under the provisions of civil service." (*Riley, supra,* 9 Cal.2d at p. 135.) Literally read, *Riley* prohibits the contracting out of services in virtually every factual scenario imaginable, regardless of economic considerations. In short, *Riley* requires that the state hire new employees, as opposed to contracting with the private sector, whenever it is *possible* to hire someone to perform the services at issue, regardless of any other considerations. Such an interpretation goes well beyond the purpose of article VII and what is necessary to protect the civil service system. It results in an ever-expanding government payroll and exalts the entity of the civil service

system over considerations of economic responsibility and economic sensibility. To the extent that may be interpreted as the meaning of *Riley*, it must be rejected.

Nevertheless, I agree with the majority that *Riley* and its progeny need not be overruled at this time. I do so not because I agree with the possible consequences of these cases, but because it is not necessary to overturn established precedent in order to uphold the legislation at issue here. The majority acknowledge judicial interpretations of *Riley* which find exceptions to the expressed rule of that case by permitting the state to contract privately for services that state employees have traditionally performed if those services (1) are of a nature that they could not be performed "adequately and competently," *or more economically*, through civil service (*Riley, supra,* 9 Cal.2d at p. 135; *CSEA, supra,* 199 Cal.App.3d at pp. 851-853), (2) represent a new state function (*Williams, supra,* 7 Cal.App.3d at p. 397), or (3) are being withdrawn from state service, or "privatized," on an experimental basis (*Professional Engineers* v. *Department of Transportation* (1993) 13 Cal.App.4th 585, 592-594 [16 Cal.Rptr.2d 599].) It is the economic savings exception which is applicable here to find Chapter 433 constitutional on its face.

The implication of an "economic savings" requirement is inherent in a common-sense reading of Chapter 433. (See *County of Los Angeles* v. *Legg* (1936) 5 Cal.2d 349, 353 [55 P.2d 206] [sufficient that statute makes limitation, required by Constitution, by necessary inference from its language].) Although not explicitly stated in the act, it is apparent that implicit in Chapter 433 is a provision that contracting out must make economic sense—it must be cheaper than using civil service—and that the discretion of the Director of Transportation (Director) to contract out must be exercised toward that end. (See *People* v. *Globe Grain & Mill Co.* (1930) 211 Cal. 121, 128 [294 P. 3] ["It is to be presumed that the commission will exercise its powers in conformity with the statute and Constitution of the state."].)[7]

This court has refused to undertake wholesale judicial amendment of legislation. (See, e.g., *Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420, 444-445 [134 Cal.Rptr. 650, 556 P.2d 1101]; *Elliott, supra,* 17 Cal.3d at p. 594; *Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 282 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206].) However, "a reviewing court may, in appropriate circumstances, and consistently with the separation of powers doctrine,

---

[7]Although *Globe Grain* concerned a statute which contained some express limits on the commission's exercise of discretion, I see no reason why the same presumption should not apply here.

reform a statute to conform it to constitutional requirements in lieu of simply declaring it unconstitutional and unenforceable." (*Kopp* v. *Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 615 [47 Cal.Rptr.2d 108, 905 P.2d 1248].) "[W]herever possible, [this court] will interpret a statute as consistent with applicable constitutional provisions, seeking to harmonize Constitution and statute. [Citations.]" (*Elliott, supra,* 17 Cal.3d at p. 594.) This is because this court "[is] bound, if possible, to construe a statute in a fashion that renders it constitutional." (*In re M.S., supra,* 10 Cal.4th at p. 710.) This court has followed this principle in a wide variety of situations.[8] With regard to Chapter 433, implication of an "economic savings" requirement constitutes a fair and reasonable interpretation of the legislation, and is both permissible and appropriate. (See *Kopp* v. *Fair Pol. Practices Com., supra,* 11 Cal.4th at p. 615.)

That the Legislature intends to encourage contracting out indicates a finding by that body that contracting out is frequently less expensive than hiring new employees, especially when the costs of short-term hiring and layoffs are taken into account. This reading is supported by the Legislature's express finding in section 14130, subdivision (a)(3), which recites that contracting out "avoid[s] the costly process of short-time hiring and layoff while still responding in a timely manner to funding opportunities and uncertainties[.]"

Subdivision (d) of section 14130 arguably can be read as contradicting such an implicit provision of economic savings.[9] However, when read with a view toward finding the statute constitutional (see *Miller* v. *Municipal Court*

---

[8]See, e.g., *In re M.S., supra,* 10 Cal.4th at page 710 (overbreadth and vagueness attacks on hate crimes statute); *Calfarm Ins. Co.* v. *Deukmejian, supra,* 48 Cal.3d at page 822, footnote 15 (attack on facial validity of initiative measure); *Metromedia, Inc.* v. *City of San Diego* (1982) 32 Cal.3d 180, 186 [185 Cal.Rptr. 260, 649 P.2d 902] (billboard ordinance); *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 175 [167 Cal.Rptr. 854, 616 P.2d 836] (involuntary conservatorship provisions); *In re Klor* (1966) 64 Cal.2d 816, 821 [51 Cal.Rptr. 903, 415 P.2d 791] (anti-obscenity statute); *Geiger* v. *Board of Supervisors* (1957) 48 Cal.2d 832, 839 [313 P.2d 545] (whether sales tax levy was subject to referendum); *Busch* v. *Turner* (1945) 26 Cal.2d 817, 820 [161 P.2d 456, 171 A.L.R. 1063] (applicability of statutory salary increase to incumbent); *Collins* v. *Riley, supra,* 24 Cal.2d at page 915 (whether statute reimbursing "traveling expenses" impermissibly increased mileage allotment); *County of Los Angeles* v. *Riley* (1936) 6 Cal.2d 625, 627 [59 P.2d 139, 106 A.L.R. 903] (taxation; "[W]hen the general nature of counties is considered and weight is given to the proper rules of construction, we are bound to read this limitation into the statute, in order to sustain, if possible, the constitutionality of the act."); *People* v. *Globe Grain & Mill Co., supra,* 211 Cal. at page 127 (statute justifying what would otherwise have been a nuisance); *Burns* v. *Superior Court* (1903) 140 Cal. 1, 7-8 [73 P. 597] (superior court's power regarding contempt).

[9]That subdivision provides: "(d) In furtherance of the Legislature's intent to encourage contracting out by the department, the department shall not be required to utilize state employees to perform all engineering and related services to the maximum extent required to

(1943) 22 Cal.2d 818, 828 [142 P.2d 297]), a reasonable construction is that Caltrans is not *required* to hire all the new staff it can use, but can contract out if economically advantageous.[10]

Thus, Chapter 433, when properly interpreted, does not disregard the constitutional restriction on private contracting, but instead is consistent with the purposes of article VII. *It does not prevent the hiring of additional civil service personnel, nor does it require or permit the displacement of existing civil service personnel.*[11] It simply allows the Director the discretion to contract out where such a move makes economic sense. I fail to see how this threatens the civil service system or runs afoul of article VII, which was never intended to require an ever-expanding government payroll. By enacting article VII, the electorate sought to obtain fiscal responsibility in government. A requirement that the state must expand its work force whenever —and however temporarily—its workload expands, no matter what the cost or how much cheaper the service would be if contracted out, would be the antithesis of such a goal.

In examining Chapter 433, it must be presumed the Legislature intended its act to be valid and to fall within the scope of its constitutional powers. (*In re Rodriguez* (1975) 14 Cal.3d 639, 652 [122 Cal.Rptr. 552, 537 P.2d 384]; *Miller* v. *Municipal Court, supra,* 22 Cal.2d at p. 828; see *San Francisco Taxpayers Assn.* v. *Board of Supervisors* (1992) 2 Cal.4th 571, 581 [7 Cal.Rptr.2d 245, 828 P.2d 147].) As this court cogently stated more than 90 years ago, "In determining the constitutionality of an act of the legislature, *courts always presume in the first place that the act is constitutional.* They also presume that the legislature acted with integrity, and with an honest

---

meet the goals of this article. The department is not required to staff to an internal level that matches its ability to assimilate and productively use new staff."

[10]I do not consider the impact, if any, of Government Code section 14101, which states: "The department shall contract with qualified architects and engineers for the performance of work when it is determined by the Director of Transportation, with the approval of the Director of Finance, that the obtainable staff is unable to perform the particular work within the time the public interest requires such to be done." The existence of this statute is not relevant to a determination as to the facial validity of Chapter 433.

[11]For instance, Government Code section 14131, which is not altered by Chapter 433, provides: "The department may contract for the services of engineers, architects, surveyors, planners, environmental specialists, and materials testing specialists to provide professional and technical services relating to project study reports, project development, surveying, and construction inspection whenever the director determines that the guidelines adopted pursuant to Section 14134 are applicable. *Services contracted for shall not cause the displacement of any permanent, temporary, or part-time employee of the department.* [¶] For purposes of this section 'displacement' means layoff, demotion, involuntary transfer to a new class, or involuntary transfer to a new work location requiring the employee to change his or her place of residence in order to be able to continue in his or her job classification." (Italics added.)

purpose to keep within the restrictions and limitations laid down by the constitution. The legislature is a coordinate department of the government, invested with high and responsible duties, and it must be presumed that it has considered and discussed the constitutionality of all measures passed by it." (*Beach* v. *Von Detten* (1903) 139 Cal. 462, 464-465 [73 P. 187], italics added.)

Neither the passage of time nor intervening authorities have lessened the applicability of these legal principles. In my view, the majority err by presuming *not* that the Legislature intended its enactment to be consistent with the purposes of article VII, but that it intended its enactment as a way to circumvent the limitations which have been judicially imposed to implement that constitutional mandate.

In this regard, the prohibition against contracting out is not a direct constitutional expression: nowhere does article VII expressly say what *Riley* and its progeny say it means. Instead, *Riley* is a judicial interpretation which itself has been judicially interpreted by later cases. Thus, as the majority acknowledge (maj. opn., *ante*, at p. 565), "we deal with a constitutional provision of a kind, similar to many others, which necessarily and over a period of time will require judicial, legislative and administrative construction." (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra*, 22 Cal.3d at p. 244 [construing Cal. Const., art. XIII A].)

Chapter 433 constitutes a reasonable legislative construction of article VII. In *Methodist Hosp. of Sacramento* v. *Saylor, supra*, 5 Cal.3d at page 692, this court held that a "settled principle" is the "strong presumption in favor of the Legislature's interpretation of a provision of the Constitution." This court continued: "That presumption has been phrased differently over the years, but its import remains clear. Thus in *San Francisco* v. *Industrial Acc. Com.* (1920) 183 Cal. 273, 279 . . . , the court held that 'where a constitutional provision may well have either of two meanings, it is a fundamental rule of constitutional construction that, if the Legislature has by statute adopted one, its action in this respect is well nigh, if not completely, controlling. When the Legislature has once construed the constitution, for the courts then to place a different construction upon it means that they must declare void the action of the Legislature. It is no small matter for one branch of the government to annul the formal exercise by another and coordinate branch of power committed to the latter, and the courts should not and must not annul, as contrary to the constitution, a statute passed by the Legislature, unless it can be said of the statute that it positively and certainly is opposed to the constitution. This is elementary. But plainly this

cannot be said of a statute which merely adopts one of two reasonable and possible constructions of the constitution.'

"In *Pacific Indemnity Co.* v. *Indus. Acc. Com.* (1932) 215 Cal. 461, 464 . . . , the same reasoning led us to the statement that 'For the purpose of determining constitutionality, we cannot construe a section of the Constitution as if it were a statute, and adopt our own interpretation without regard to the legislative construction. Where more than one reasonable meaning exists, it is our duty to accept that chosen by the legislature.' (Accord, *Lundberg* v. *County of Alameda* (1956) 46 Cal.2d 644, 652 . . . .) Again, in *Delaney* v. *Lowery* (1944) 25 Cal.2d 561, 569 . . . , we referred to the presumption of constitutionality and the rule of strict construction of constitutional limitations on the Legislature, and concluded, 'Those principles indicate the latitude and effect to be given a legislative construction or interpretation of the Constitution. When the Constitution has a doubtful or obscure meaning or is capable of various interpretations, the construction placed thereon by the Legislature is of very persuasive significance.' The rule, moreover, remains viable today. (See, e.g., *County of Madera* v. *Gendron* (1963) 59 Cal.2d 798, 802 . . . ; *Miro* v. *Superior Court* (1970) 5 Cal.App.3d 87, 99 . . . ; *Dept. of Alcoholic Bev. Control* v. *Superior Court* (1968) 268 Cal.App.2d 67, 74 . . . .)" (*Methodist Hosp. of Sacramento* v. *Saylor, supra,* 5 Cal.3d at pp. 692-693.)

Similarly, in *California Housing Finance Agency* v. *Patitucci, supra,* 22 Cal.3d 171, 177, this court stated: "We . . . are very mindful that article XXXIV [concerning local elections on low-rent housing projects] is a direct expression of the People who, alone, have the power to adopt or change the Constitution [citation], and that the judiciary, rather than the Legislature, is principally charged with its construction. Nonetheless, we affirm the Legislature's interpretive efforts unless they are disclosed to be unreasonable or clearly inconsistent with the express language or clear import of the Constitution." In *Patitucci*, this court noted that the constitutional provision was not completely unambiguous; reasonable minds could differ as to whether a particular mixed income development constituted a low-rent housing project. The court concluded: "[T]he Legislature, with its extensive fact-finding powers, is better suited than we are to assess the financial and aesthetic consequences of its policies. When it has made such judgments, we will not disturb them unless they are inherently improbable or unreasonable." (*Id.* at p. 179.)

In the case of article VII, it cannot reasonably be said the meaning of the constitutional provision is clear or that its construction is not disputed.

Accordingly, there is a strong presumption in favor of the Legislature's efforts at interpretation. Moreover, an Assembly Transportation Committee report submitted to the Legislature before it adopted Chapter 433 acknowledged that questions existed concerning the constitutionality of the legislation. As this court has stated *in conjunction with legislation alleged to be in violation of article VII,* "the presumption of constitutionality accorded to legislative acts is particularly appropriate when the Legislature has enacted a statute with the relevant constitutional prescriptions clearly in mind. [Citation.] In such a case, the statute represents a considered legislative judgment as to the appropriate reach of the constitutional provision. Although the ultimate constitutional interpretation must rest, of course, with the judiciary [citation], a focused legislative judgment on the question enjoys significant weight and deference by the courts." (*Pacific Legal Foundation* v. *Brown, supra,* 29 Cal.3d at p. 180.)

In my view, the findings and statements of intent included in Chapter 433 are not inconsistent on their face with appropriate constitutional interpretation of article VII. There is nothing before me to show the Legislature was "clearly and palpably wrong" in its findings and declarations. (*Lockard* v. *City of Los Angeles, supra,* 33 Cal.2d at p. 461.)[12] The whole purpose of Chapter 433, including its intent and findings, is geared toward a cheaper, more expedient and economic way of doing things. This is consistent with article VII, as interpreted by *Riley* and its progeny.[13]

In sum, I submit that the Court of Appeal majority correctly recognized that Chapter 433 is consistent with article VII as furthering the goals of

---

[12]The determination, contained in section 14130, subdivision (a)(5), that the use of private consultants to assist in project delivery is a new state function, is not a factual determination. (See *Department of Transportation* v. *Chavez* (1992) 7 Cal.App.4th 407, 414 [9 Cal.Rptr.2d 176].) It is a legal conclusion to which courts do not defer. To me, however, the existence of this provision further shows the Legislature was aware of *Riley* and its progeny and was attempting to enact legislation that would pass constitutional muster.

I note, as did the Court of Appeal, the arguable illogic of a portion of the finding contained in section 14130, subdivision (a)(4), that "Without the ability to continue a stable contracting out program, . . . the department will not be able to perform project delivery adequately, competently, or satisfactorily, thereby necessitating the use of private consultants to supplement its in-house staff." Nevertheless, this declaration does not detract from the overall legislative finding that a stable contracting out program is necessary for adequate project delivery.

[13]The majority determine that Chapter 433 does not contain findings that would excuse noncompliance with the civil service mandate or afford a legitimate basis for disregarding the constitutional restriction on private contracting. On its face, however, Chapter 433—when properly read and viewed under settled legal principles—does not run afoul of the civil service mandate. As it neither fails to comply with that mandate nor disregards the constitutional restriction on contracting out, I would not expect it to contain findings which would seek to excuse noncompliance with or disregard of article VII.

efficient, cost-effective government—which is the *expressed* purpose in the original ballot argument—and that the legislation does not impair the integrity of civil service. I do not find such a conclusion inconsistent with a reasonable application of *Riley* and its progeny. In fact, I conclude that a contrary interpretation is difficult to reconcile with the ballot argument originally expressed in the predecessor to article VII, "to promote efficiency and economy in state government."

### III. *The Majority Unreasonably Interfere With the Separation of Powers.*

Finally, the majority's determination that Chapter 433 is unconstitutional on its face unreasonably and improperly encroaches upon the prerogative of the legislative branch of government, thereby interfering with the separation of powers.[14]

The doctrine of separation of powers is a precept which is central to our constitutional form of government. As this court recently explained, "Although the language of California Constitution article III, section 3, may suggest a sharp demarcation between the operations of the three branches of government, California decisions long have recognized that, in reality, the separation of powers doctrine ' "does not mean that the three departments of our government are not in many respects mutually dependent" ' [citation], or that the actions of one branch may not significantly affect those of another branch. Indeed, . . . the substantial interrelatedness of the three branches' actions is apparent and commonplace: the judiciary passes upon the constitutional validity of legislative and executive actions, the Legislature enacts statutes that govern the procedures and evidentiary rules applicable in judicial and executive proceedings, and the Governor appoints judges and participates in the legislative process through the veto power. Such interrelationship, of course, lies at the heart of the constitutional theory of 'checks and balances' that the separation of powers doctrine is intended to serve.

"At the same time, this doctrine unquestionably places limits upon the actions of each branch with respect to the other branches. The judiciary, in reviewing statutes enacted by the Legislature, may not undertake to evaluate the wisdom of the policies embodied in such legislation; absent a constitutional prohibition, the choice among competing policy considerations in enacting laws is a legislative function. [Citation.] The executive branch, in expending public funds, may not disregard legislatively prescribed directives

---

[14]Article III, section 3 of the California Constitution states: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."

and limits pertaining to the use of such funds. [Citation.] And the Legislature may not undertake to readjudicate controversies that have been litigated in the courts and resolved by final judicial judgment. [Citations.]" (*Superior Court* v. *County of Mendocino, supra,* 13 Cal.4th at pp. 52-53.)

Unless a statute's unconstitutionality " 'clearly, positively, and unmistakably appears' " (*Calfarm Ins. Co.* v. *Deukmejian, supra,* 48 Cal.3d at p. 814), the judiciary should not interfere. The majority in effect apply a species of "independent review" to the Legislature's factual findings, which would allow courts to decide for themselves whether the evidence supported the Legislature's determinations and conclusions or to make sure the Legislature—in the reviewing court's view—had before it "sufficient" evidence to warrant its enactment of the particular legislation at issue.

The ramifications of such an expansive view of the court's role vis-á-vis that of a coequal branch of government, are far-reaching and pernicious. In order to enact laws that would be upheld against constitutional challenges, would the Legislature be required to hold extensive evidentiary hearings? Would it be bound by the Evidence Code as to what evidence it could consider? What standard of evidence would the reviewing court require? Would a court passing upon the constitutionality of legislation be permitted to take evidence supporting or opposing the law, as the trial court in effect did here? If so, would the constitutionality of legislation then become a question of which side hired the best attorney? The majority opinion has the strong potential to hamstring the Legislature every time its proposed legislation touches upon a "constitutional mandate."

The majority's view is not supported by precedent, but instead presents a sharp and unwarranted departure therefrom. As previously explained, the Legislature's factual determinations may be set aside or disregarded by the courts only if the fact of error " 'appears beyond reasonable doubt from facts or evidence which cannot be controverted, and of which the courts may properly take notice.' [Citations.]" (*Lockard* v. *City of Los Angeles, supra,* 33 Cal.2d at p. 461.) If the error does not so appear, " 'the legislative determination that the facts exist which make the law necessary' " (*ibid.*) is binding on the courts in the sense that the courts cannot then go behind those findings to find factual error or lack of what might be termed evidentiary support. Thus, the requirements that courts presume legislative enactments to be constitutional and that such great weight be given to legislative findings that they will be upheld unless they are palpably erroneous, does not mean those findings are placed totally beyond the power of courts to

review. Necessarily under the separation of powers doctrine, however, courts are limited in what they can review to determine the propriety of legislative findings of fact and determinations. If the *Lockard* requirements for disregard of the legislative findings and determinations are not met, a court must then accept the facts as found by the Legislature and determine whether, based on those facts, the legislation comports with the Constitution. (See *Amwest, supra*, 11 Cal.4th at pp. 1253-1255.)

The majority cite *Amwest* as supporting greater judicial latitude regarding legislative findings, noting that even though legislative findings generally will be upheld, "we also must enforce the provisions of our Constitution and 'may not lightly disregard or blink at . . . a clear constitutional mandate.'" (*Amwest, supra*, 11 Cal.4th at p. 1252.) However, *Amwest* is not analogous. There, the initiative measure known as Proposition 103 provided that it could not be amended by the Legislature except to further the purposes of that act. At issue was whether a subsequently enacted statute furthered the purposes of the act. This court had to determine the standard of review applicable to that question. On the one hand, the plaintiff relied on the presumption of constitutionality to argue for a deferential standard, while its opponents argued the question was one of statutory interpretation which the court should consider de novo. (*Amwest, supra*, at pp. 1247, 1251.) This court stated: "In the present case, . . . the construction of article II, section 10, subdivision (c) of the California Constitution *is not disputed*. The parties agree that the Legislature has the authority to amend Proposition 103 without voter approval, but only to further the purposes of the initiative. In enacting [the statute in question], the Legislature did not purport to interpret the Constitution, but only to amend the statutory provisions enacted by Proposition 103. The issue before us is whether the Legislature exceeded its authority. The 'rule of deference to legislative interpretation' of the California Constitution, therefore, has no application in the present case. We do, however, apply the general rule that 'a strong presumption of constitutionality supports the Legislature's acts. [Citations.]'" (*Amwest, supra*, 11 Cal.4th at p. 1253, italics added.)

This court explained that when dealing with the question of whether to uphold the Legislature's determination that an urgency measure is necessary, it applies "the rule that a declaration of urgency by the Legislature will not be declared invalid 'unless it "appears clearly and affirmatively from the legislature's statement of facts that a public necessity does not exist." [Citations.]' 'If there is any doubt as to whether the facts do or do not state a case of immediate necessity, that doubt should be resolved in favor of the legislative declaration . . . .' [Citation.] The reason for this rule is that *the*

*question* whether such necessity exists *is one of fact to be determined by the Legislature.*" (*Amwest, supra,* 11 Cal.4th at pp. 1253-1254, italics added; accord, *Stockburger* v. *Jordan* (1938) 10 Cal.2d 636, 642 [76 P.2d 674] [determination of necessity for urgency measure is purely a legislative question; courts will not interfere with determination "save in those few exceptional cases where it appears clearly and affirmatively from the legislature's statement of facts that a public necessity does not exist."].) Where, on the other hand, the question was whether the urgency legislation violated the Constitution by abolishing or changing the duties of an office, "[a]lthough this court accorded great deference *to the Legislature's factual determination* that urgency legislation was necessary, we went on to consider, *as a question of law,* whether the urgency measure at issue 'create[d] any office or change[d] the salary or duties of any officer, or create[d] any vested right or interest.' [Citation.] In addressing this issue, we simply examined the provisions of the statute and determined that they were not of the type forbidden in urgency legislation. [Citation.]" (*Amwest, supra,* 11 Cal.4th. at p. 1254, italics added.) With regard to the question before it, this court concluded: "Accordingly, starting with the presumption that the Legislature acted within its authority, we shall uphold the validity of [the statute at issue] if, by any reasonable construction, it can be said that the statute furthers the purposes of Proposition 103." (*Id.* at p. 1256.)

Here, by contrast, Chapter 433 constitutes an interpretation of a constitutional provision, the construction and limits of which are disputed.

There is one area in which it has been said "that the ordinary deference a court owes to any legislative action vanishes," and that is "when constitutionally protected rights are threatened." (*Spiritual Psychic Science Church* v. *City of Azusa* (1985) 39 Cal.3d 501, 514 [217 Cal.Rptr. 225, 703 P.2d 1119].) However, I have been unable to find any authority which applies this principle outside the area of legislation being subjected to scrutiny under the First Amendment to the United States Constitution.

The majority cite *Turner Broadcasting System, Inc.* v. *FCC* (1994) 512 U.S. 622 [114 S.Ct. 2445, 129 L.Ed.2d 497] for the proposition that the deference afforded to legislative findings does not foreclose a court's independent judgment of the facts, and that the court is obligated to assure that the legislative body has drawn reasonable inferences based on substantial evidence. In reality, *Turner* states: "That Congress' predictive judgments are entitled to substantial deference does not mean, however, that they are insulated from meaningful judicial review altogether. On the contrary, we

have stressed *in First Amendment cases* that the deference afforded to legislative findings does 'not foreclose our independent judgment of the facts bearing on an issue of constitutional law.' [Citations.] This obligation *to exercise independent judgment when First Amendment rights are implicated is not a license to reweigh the evidence de novo, or to replace Congress' factual predictions with our own.* Rather, it is to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence. [Citation.]" *(Turner, supra,* 512 U.S. at p. 666 [114 S.Ct. at p. 2471] (lead opn. of Kennedy, J.), italics added.)

Thus, when read it context, it is clear that *Turner* does nothing to undermine the general rule of deference afforded to a legislative body's factual findings. Nothing in *Turner* or the cases on which it relies suggests that the standard enunciated in *Turner* applies outside the First Amendment realm. Where other areas of the law are concerned, the United States Supreme Court has made it clear that "a legislative choice is not subject to courtroom factfinding *and may be based on rational speculation unsupported by evidence or empirical data.* [Citations.] ' "Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function." ' [Citations.]" *(FCC* v. *Beach Communications, Inc.* (1993) 508 U.S. 307, 315 [113 S.Ct. 2096, 2102, 124 L.Ed.2d 211], italics added.)

The majority's reliance on *Turner* is misplaced. Moreover, even assuming that non-First Amendment areas exist in which application of a lesser standard of deference might be appropriate, this is not one of them.[15] Article VII does not involve "constitutionally protected rights," nor does Chapter 433 threaten such rights. Accordingly, there is no basis for the majority's unacknowledged abandonment of the long line of authorities I have previously discussed.

The judiciary's review of legislative acts must be circumspect and deferential, reflecting the constraints of the Constitution. Otherwise, the judicial branch may be perceived as assuming the role of arbiter of social and fiscal policy, a role which is properly left to the representative branch of government. It is this fundamental allocation of responsibility that undergirds our

---

[15]For instance, in *Mills* v. *Superior Court, supra,* 42 Cal.3d 951, 957, this court determined that it must "subject to careful scrutiny any legislation restricting the ability of defendants to cross-examine witnesses whose testimony is offered as evidence of probable cause [at a preliminary hearing]." Even when applying "careful scrutiny," however, this court stated: "At the same time, we are mindful that it is our duty to uphold a statute unless its unconstitutionality clearly, positively, and unmistakably appears; all presumptions and intendments favor its validity. [Citations.]" *(Ibid.)*

tripartite system. For the judiciary to litigate and reject the factual conclusions of the legislative branch supporting its policy determinations—and even to come to opposite conclusions—strikes at the heart of this delicate structure. Courts are neither policymakers nor legislative fact finders. It is for the Legislature to find the facts and it falls to us to respect those findings unless they are clearly wrong—wrong without reasoned dispute or the influence of opposing perspectives. That is not to say we are required to acknowledge the emperor's clothing if he is naked; rather, it is to say that if we cannot by resort to what reasonable people know to be indisputably true reach a contrary finding, we must accept and respect the findings of those who have that responsibility.

For these reasons, I conclude the trial court erroneously found Chapter 433 unconstitutional on its face. I would affirm the decision of the Court of Appeal reversing the trial court.

Respondents' petition for a rehearing was denied July 16, 1997. Werdegar, J., and Brown, J., did not participate therein. Baxter, J., was of the opinion that the petition should be granted.